**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **DENNY LINDLEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.   08-CV-379-CVE-PJC** |
| | ) | |
| **LIFE INVESTORS INSURANCE** | ) | |
| **COMPANY OF AMERICA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**OPINION AND ORDER**

Before the Court is the Motion to Compel Against Glenn Coffee filed by Plaintiff Denny

Lindley ("Lindley") (Dkt. #74)**.**  Lindley seeks to compel non-party, the Honorable Glen Coffee

("Senator Coffee"), President Pro Tempore of the Oklahoma State Senate, to produce the

following documents pursuant to the Subpoena issued on February 12, 2009:

a.   Any documents that you received from Fried.Kilpatrick.Guinn and/or
American Fidelity in connection with any proposed language to be
included in the Actual Charge Legislation or any other legislation
concerning the definition of "actual charge(s)" or "actual fee(s)."

b.   All documents relating to, evidencing, memorializing or summarizing
any drafts of, revisions to, or proposal language for, the Actual
Charge Legislation.

c.   All documents relating to, evidencing, memorializing or summarizing or
recording any Communications between you and American Fidelity
concerning: (a) any proposed or passed legislation relating to the
definition of "actual charge" or "actual fee"; and/or (b) the Actual Charge
Legislation.

d.   All documents, including, internal memoranda relating to: (a) the
definition of "actual charge(s)" or "actual fee(s)," "expense(s) incurred" or
"incurred expense(s)"; (b) legislation (proposed or passed) concerning
such definition(s); and/or (c) the Actual Charge Legislation.

e.   All documents relating to, evidencing, memorializing or summarizing
your knowledge and/or understanding of the terms, coverages, limitations,
and benefits contained in any Limited Benefit Specified Disease Cancer
Expense Policy sold by American Fidelity.

f.   All documents relating to, evidencing, memorializing or summarizing the

      Actual Charge Litigation[1] or any other lawsuits, claims or disputes concerning the interpretation of the phrase "actual charge(s)" within the context of an insurance policy.

g.    All documents relating to, evidencing, memorializing, summarizing or recording Communications (including e-mails) between you and any member, official, officer, employee or agent of the legislature, judicial or executive branch of the Oklahoma government concerning: any proposed or passed legislation relating to the definition of "actual charge" or "actual fee"; and/or (b) the Actual Charge Legislation.

h.    All documents relating to, evidencing, memorializing, summarizing, comprising or recording communications (including e-mails) between you and the Commissioner or any members, officers, employees or agents of the Insurance Department concerning: (a) any proposed or passed legislation relating to the definition of "actual charge" or "actual fee"; and/or (b) the Actual Charge Legislation.

I.    All documents relating to, evidencing, memorializing, summarizing, comprising or recording any proposed drafts of, revisions to and/or proposed language to be included in the Actual Charge Legislation.

j.    All documents relating to, evidencing, memorializing, summarizing or recording any communications (including e-mails), analysis, discussion, debates, investigations and research concerning whether the Actual Charge Legislation, as proposed, revised, amended, passed or codified, constitutes an unlawful ex post facto law by effectively impairing the contractual rights of Oklahoma policyholders in violation of the Constitutions of the United State and/or Oklahoma.

k.    All documents relating to, evidencing, memorializing, summarizing or recording any statements, representations, or testimony to any legislative, executive or judicial body relating to the Actual Charge Legislation.

l.    All documents, including internal memoranda, all Communications and all drafts of legislative revisions relating to the inclusion of 36 O.S. § 3651(c) in the Actual Charge Legislation which states: "This section applies to an insurance policy in effect on the effective date of this act, only if the policy does not define 'actual charges' or 'actual fee.'"

---

[1] The "Actual Charge Litigation" refers to the lawsuit brought by Delores Metzger against American Fidelity Assurance Company ("American Fidelity") in the Western District of Oklahoma, *Metzger v. American Fidelity Assurance Company*, Case No. CIV-05-1387-M. Metzger brought suit similar to this one, although against American Fidelity, the insurer who issued her deceased son a "cancer and specified disease treatment" policy. Metzger claimed that American Fidelity underpaid her son benefits under the policy because it paid the post-negotiation amount of the provider's medical bill as "actual charges" and that the breach was in bad faith. In September 2006 United States District Judge Vicki Miles-LeGrange held that "actual charges" under the policy referred to pre-negotiation and not post-negotiation amounts of a provider's medical bills. In January 2008, the jury awarded Metzger $503,500 in actual damages and more than $10.3 million in punitive damages.

Lindley states that these documents are relevant because Defendant Life Investors Insurance Company of America ("Life Investors") is relying on the "Actual Charge Legislation," Okla.Stat.tit. 36, §3651 (2006),[2] in part of its defense of this action; *i.e.*, one of Life Investors' defenses is that some or all of Lindley's claims are barred by the statute. *See* Answer and Counterclaim, Fifth Defense (Dkt. #9).  Lindley further contends that the statute is unconstitutional and relevant to his bad faith claim as Life Investors is "relying on this *ex post facto* legislation for the sole purpose of retroactively depriving its insured of their fixed contractual rights to coverage. *Plaintiff's Motion to Compel, p. 3* (Dkt. #74).[3]

Senator Coffee resists the above discovery based on legislative immunity or the "Speech or Debate Clause" privilege.  He contends that all of the documents he has been subpoenaed to authenticate and produce are the result of the legislative process and thus not discoverable. Lindley responds that (1) the privilege does not extend to documents; (2) if the privilege does extend to documents, the documents sought relate to "political activities," not "legislative activities"; and (3) if the privilege shields the documents from discovery, Senator Coffee waived

---

[2] "Actual charge" and "actual fee" defined--Application
A. As used in an individual or group specified disease insurance policy, "actual charge" or "actual fee" means the amount actually paid by or on behalf of the insured and accepted by a provider for services provided. Insurance policies that use these terms must use them as defined in this section.
B. Except as provided by subsection C of this section, the change in law made by this section applies only to insurance policies delivered, issued for delivery, or renewed on or after the effective date of this act. An insurance policy delivered, issued for delivery, or renewed before the effective date of this act is governed by the law in effect immediately before that date, and that law is continued in effect for that purpose.
C. This section applies to an insurance policy in effect on the effective date of this act only if the policy does not define "actual charge" or "actual fee".
Okla.Stat.tit.36, § 3651.  The effective date of this legislation was November 1, 2006.

[3] The "Actual Charge Legislation," later codified at Okla.Stat.tit.36, §3651, was introduced by Ron Peterson of the House and Senator Coffee of the Senate of Oklahoma in February 2006.  The legislation was passed by the Oklahoma State Legislature on May 9, 2006.

the privilege by failing to meet the requirements of Rule 45(d)(2)(A).

**I.      Legislative immunity/privilege and the "Speech and Debate Clause" under the federal and state constitutions**

The principle of "legislative immunity"/"legislative privilege" derives from the common law as well as federal and state constitutional law.   Legislative immunity/privilege has its roots in the 17th and 18th century struggle for power between the Stuart monarchy and Parliament in England, in which the monarchs exerted "pressure on members of Parliament by using judicial process to make them more responsive to their wishes."  *United States v. Gillock*, 445 U.S. 360, 368-69 (1980).  From the English and American common law which subsequently developed, the authors of the United States Constitution[4] drafted an explicit provision referred to as the "Speech or Debate Clause" of the United States Constitution:

> The Senators and Representatives . . .  shall in all Cases, except Treason, Felony and Breach of the Peace, be privileged from Arrest during their Attendance at the Session of their respective Houses, and in going to and returning from the same; and for any Speech or Debate in Either House, they shall not be questioned in any other Place.

U.S.Const. Art. I §6, ¶1.  The reasons underlying the Clause are "first, the need to avoid intrusion by the Executive or Judiciary into the affairs of a coequal branch, and second, the desire to protect legislative independence."  *Gillock*, 445 U.S. at 369 (citing  *Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 502-503 (1975)).  Thus the Clause grants not only substantive immunity of a legislator from civil and criminal liability arising out of legislative

---

[4] James Wilson, who is credited with drafting this provision, summarized the reasons for including it in the United States Constitution:
> "In order to enable and encourage a representative of the public to discharge his public trust with firmness and success, it is indispensably necessary, that he should enjoy the fullest liberty of speech, and that he should be protected from the resentment of every one, however powerful, to whom the exercise of that liberty may occasion offense."

*Tenney v. Brandhove*,  341 U.S. 367, 373 (1951) (citing II Works of James Wilson (Andrews ed. 1896)).

acts and the motivation for those acts,[5] but also an evidentiary privilege against use of such acts or motive. *Gravel v. United States*, 408 U.S. 606, 616 (1972) (finding that Senator Gravel "may not be made to answer – either in terms of questions or in terms of defending himself from prosecution – for the events that occurred at the subcommittee meeting."); *Fields v. Office of Eddie Bernice Johnson*, 459 F.3d 1, 14 (D.C.Cir. 2006) ("This evidentiary privilege includes a 'testimonial privilege.' A Member 'may not be made to answer' questions – in a deposition, on the witness stand, and so forth – regarding legislative activities.'"). Generally, legislators' immunity from suit is referred to as "legislative immunity," and the evidentiary privilege accorded legislators is referred to as the "legislative privilege"; however, the terms are also used interchangeably. The discovery dispute before the Court does not implicate the Speech or Debate Clause of the United States Constitution as it concerns the applicability and scope of the legislative privilege held by a state, not a federal, legislator.[6] Oklahoma, however, has adopted a constitutional provision essentially identical to the federal:[7]

---

[5] The Supreme Court in *United States v. Johnson*, 383 U.S. 169 (1966) recognized that legislators were immune from prosecution not only for legislative acts but also from the member's "motives for performing them." *Id*. at 185.

[6] Although the "Speech or Debate Clause" is limited to federal legislators, the United States Supreme Court extended the common law legislative privilege to state legislators sued in a federal civil rights action in *Tenney v, Brandhove*, 341 U.S. 367 (1951). The Court, however, refused to extend the privilege to state or local legislators in federal criminal prosecutions. *Gillock*, 445 U.S. at 373 ("[W]e believe that recognition of an evidentiary privilege for state legislators for their legislative acts would impair the legitimate interest of the Federal Government in enforcing its criminal statutes with only speculative benefit to the state legislative process.").

[7] Article V, section 22 is an original provision of the Oklahoma Constitution which was adopted by a vote of the people on September 17, 1907. *Howard v. Webb*, 570 P.2d 42, 46 n.7 (Okla. 1977). Oklahoma Supreme Court Justice Marion Opala described the origin of the state "Speech or Debate" Clause in *Ethics Comm'n of State of Okla. v. Cullison,* 850 P.2d 1069 (Okla.1993) (Opala,J., concurring):

Our Speech and Debate Clause was taken directly from the United States Constitution's Art. I, § 6, cl. 1, which provides that senators and representatives " for any Speech or Debate in either House ... shall not be questioned in any other Place." The origin of the Clause is attributed to the practice of the British Parliament. A suit against a member of

> Senators and Representatives shall, except for treason, felony, or breach of the peace, be privileged from arrest during the session of the Legislature, and in going to and returning from the same, and, for any speech or debate in either House, shall not be questioned in any other place.

Okla. Const. Art. 5 § 22.  Further, the Oklahoma Supreme Court has recognized that the state clause "provides at least as much protection as the immunity granted by the comparable provisions of the Federal Constitution."  *Brock v. Thompson*, 948 P.2d 279, 288 n. 26 (Okla. 1997).

In a diversity case such as this, it is the law of the state which supplies the rule of decision; thus, the legislative privilege claimed by Senator Coffee is determined under Oklahoma law, specifically, Article 5, Section 22 of the Oklahoma Constitution.  *See* Fed.R.Evid. 501. As there are few Oklahoma Supreme Court decisions interpreting the state constitutional provision and those that do are guided by United States Supreme Court interpretations of the essentially identical federal constitutional provision, the Court also looks to interpretations of the "Speech or Debate" Clause in the United States Constitution regarding legislative privilege.  *See Brock,* 948 P.2d at 287-88 (citing United States Supreme Court cases interpreting the "Speech or Debate" clause of the United States Constitution as guidance in

---

> the House of Commons in 1512 prompted Parliament to pass the first special immunity bill. The English Bill of Rights of 1689, which included a provision "[t]hat the Freedom of Speech, and Debates or Proceedings in Parliament, ought not to be impeached or questioned in any Court or Place out of Parliament," appears to be the source of the privilege found in our 1776 Articles of Confederation. The latter privilege, with only a slight modification, was carried into the U.S. Constitution as the Speech and Debate Clause.

*Id.* at 1084 n.24 (citations omitted).

> Forty-three states have constitutional legislative privilege provisions: twenty-three of them, including Oklahoma, adopted essentially identical provisions to that of the United States Constitution. Steven F. Huefner, *The Neglected Value of the Legislative Privilege in State Legislatures*, 45 Wm. & Mary L. Rev. 221, 236 (October 2003). Also, the Supreme Court has recognized state legislators' "common-law immunity from liability for their legislative acts, an immunity that is similar in origin and rationale to that accorded Congressmen under the Speech or Debate Clause." *Supreme Court of Virginia v. Consumers Union of the United States*, 446 U.S. 719, 732 (1967).

interpreting the analogous Oklahoma provision); *Oklahoma State Senate ex rel. Roberts v. Heatherington*, 868 P.2d 708, 709 (Okla. 1994) (same); *Ethics Comm'n of State of Okla. v. Cullison,* 850 P.2d 1069, 1083-85 (Okla. 1993) (Opala, J., concurring) (same); *State ex rel. Oklahoma Bar Assoc. v. Nix*, 295 P.2d 286 (Okla. 1956) (same).

## II.     Scope of the legislative privilege

Although the Speech or Debate Clause on its face appears to limit its protection to a legislator's remarks on the House or Senate floor, the United States Supreme Court has broadly interpreted the Clause as protecting "legislative acts" which are "clearly a part of the legislative process - the due functioning of the process," *United States v. Brewster*, 408 U.S. 501, 516 (1972), as well as a legislator's motivation for those acts, *United States v. Johnson*, 383 U.S. 169, 185 (1966); *Bastien  v. Office of Senator Ben Nighthorse Campbell*, 390 F.3d 1301, 1305 (10th Cir. 2004) ("[T]he Supreme Court has long treated the Clause as constitutional shorthand for a more extensive protection.").  Legislative acts are matters that are "*an integral part of the deliberative and communicative processes* by which Members participate *in committee and House proceedings* with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places with the jurisdiction of either House." *Hutchinson v. Proxmire*, 443 U.S. 111, 126 (1979) (quoting *Gravel*, 408 U.S. at 625) (emphasis in original)). "The line separating protected from unprotected legislative activity lies in the distinction between 'purely legislative activities' and those that are nongermane 'political matters.'" *Brock*, 948 P.2d at 288 (citing *Brewster*, 408 U.S. at 512).

The Tenth Circuit Court of Appeals recently summarized the decisional glosses on legislative privilege in light of the United States Supreme Court's evolving interpretations of the Clause (the majority of decisions having been handed down between 1966 and 1979) in *Bastien*

*v. Office of Senator Ben Nighthorse Campbell*, 390 F.3d 1301 (10th Cir. 2004).  First, in light of

the purpose and history of the Clause,  "'Speech or Debate' have been read broadly to

encompass all formal actions in the official business of Congress, including voting, conducting

hearings, issuing reports and issuing subpoenas."  *Id*. at 1314 (citing *Kilbourn v. Thompson*, 103

U.S. 168, 204 (1880) (Speech or Debate includes "written reports presented in that body by its

committees, to resolutions offered, which, though in writing, must be reproduced in speech, and

to the act of voting, whether it is done vocally or by passing between the tellers"); *Tenney*, *supra*

(Speech or Debate includes questioning witnesses in state investigative committee meetings);

*Doe v. McMillan*, 412 U.S. 306, 312 (1973) (The Speech or Debate Clause barred suit by

persons allegedly defamed by a committee report distributed within Congress and voted for

public dissemination by the Government Printing Office.); *Eastland v. United States*

*Servicemen's Fund*, 421 U.S. 491, 505 (1975) (Speech or Debate Clause protects votes to

authorize committee investigations as well as the issuance of subpoenas in that investigation.).

"Speech or Debate in Either House," therefore, has a formal as well as spatial meaning.[8]

Second, the Supreme Court recognized the "needs of a large and overburdened legislative

body," and expanded "Senators and Representatives" to include their functional equivalents; *e.g.*

"aides who function as their alter egos in performing legislative acts," and "committee hearings

[to be] deemed 'in' the House even when conducted far away." *Id.* at 1315 (citing *Gravel*, 408

U.S. at 616-17 ("[T]he Speech or Debate Clause applies not only to a Member but also to his

aides insofar as the conduct of the latter would be a protected legislative act if performed by the

Member himself."); *Eastland*, 421 U.S. at 507 (immunity for Chief Counsel to the Members in

---

[8] One commentator describes this as the "protection of the Clause is at least partly defined by the *real or metaphorical walls of Congress*." 26A Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure §5675 (3d. Ed. 1992).

issuing subpoena); and *Hutchinson*, 443 U.S. at 124 ("[Committee hearings are protected, even if held outside the Chambers; committee reports are also protected.")).

Third, "an act is 'questioned' not only if it is the subject of civil or criminal prosecution but even if evidence of the act is offered at a trial." *Id*. (citing *Johnson*, 383 U.S. at 173-76 (Consideration of evidence relating to legislator's floor speech, its preparation and his motives for the speech amounted to "questioning" the legislator about a legislative act.); *United States v. Helstoski*, 442 U.S. 477 (1979) (The "evidence of a legislative act of a Member may not be introduced by the Government.")).  Legislative immunity/privilege, accordingly, not only enables legislators to serve the public without fear of personal liability, but without fear of litigation itself which "creates a distraction and forces legislators to divert their time, energy, and attention from their legislative tasks to defend the litigation." *Supreme Court of Virginia v. Consumers Union of the United States*, 446 U.S. 719, 733 (1980) (brackets and internal quotation marks omitted).  As explained in *Tenney*, "The privilege would be of little value if [legislators] could be subjected to the cost and inconvenience and distractions of a trial upon a conclusion of the pleader, or to the hazard of a judgment against them based upon a jury's speculation as to motives." *Tenney*, 341 U.S. at 377; *Sable v. Myers,*  563 F.3d 1120, 1123 -1124 (10th Cir. 2009) (same).

Fourth, the broad constructions of the above "have always been confined within the limits of formal, official proceedings."  *Bastien*, 390 F.3d at 1315 (citing *Kilbourn*, 103 U.S. at 204 (limited to "things generally done in a session of the House by one of its member in relation to the business before it"); *Johnson*, 383 U.S. at 172 (The Speech or Debate Clause does not reach conduct involved in legislator's attempt to influence an agency, the Department of Justice.); *Brewster*, 408 U.S. at 512 ("Speech or Debate Clause prohibits inquiry only into those

things generally said or done in the House or Senate in the performance of official duties and into the motivation for those acts"); *Gravel*, 408 U.S. at 625 (("Insofar as the Clause is construed to reach other matters [than speech or debate in either House], they must be an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House."); *Hutchinson*, 443 U.S. at 126 ("[T]his privilege is strictly confined to things done in the course of parliamentary proceedings, and does not cover things done beyond the place and limits of duty.")).  In sum, protected acts are more than those with "some nexus to legislative functions," *Brewster*, 408 U.S. at 528; they must be "an integral part of the deliberative and communicative processes" in which legislators engage, *Gravel*, 408 U.S. at 625. And that legislative process at least includes the following acts:

> "delivering an opinion, uttering a speech, or haranguing in debate"; proposing legislation; voting on legislation;  making, publishing, presenting, and using legislative reports; authorizing investigations and issuing subpoenas; and holding hearings and "introducing material at Committee hearings."

*Fields*,  459 F.3d at 10-11 (citing United States Supreme Court decisions for each recognized legislative act) (footnotes omitted).

Accordingly, it is necessary to distinguish protected "legislative acts" from unprotected "political acts" attendant to legislator's duties.  As the Supreme Court noted in *Brewster*,

> [i]t is well known, of course, that Members of the Congress engage in many activities other than the purely legislative activities protected by the Speech or Debate Clause. These include a wide range of legitimate 'errands' performed for constituents, the making of appointments with Government agencies, assistance in securing Government contracts, preparing so-called 'news letters' to constituents, news releases, and speeches delivered outside the Congress. The range of these related activities has grown over the years. They are performed in part because they have come to be expected by constituents, and because they are a means of

> developing continuing support for future elections. Although these are entirely
> legitimate activities, they are political in nature rather than legislative, in the
> sense that term has been used by the Court in prior cases. But it has never been
> seriously contended that these political matters, however appropriate, have the
> protection afforded by the Speech or Debate Clause. Careful examination of the
> decided cases reveals that the Court has regarded the protection as reaching only
> those things 'generally done in a session of the House by one of its members in
> relation to the business before it,' or things 'said or done by him, as a
> representative, in the exercise of the functions of that office.'

*Brewster,* 408 U.S. at 512-513 (citations omitted).

And similarly, the privilege does not protect information about acts or conduct beyond

"legitimate legislative activity"; it does not protect illegal acts, purely personal acts, or a promise

to vote a certain way or give a speech at a future date.  For example, the issue before the

Supreme Court in *Brewster* was "whether it is necessary to inquire into how [former United

States Senator Daniel Brewster] spoke, how he debated, how he voted, or anything he did in the

chamber or in committee in order to make out a violation of bribery under [18 U.S.C. §201(c)]."[9]

*Brewster*, 408 U.S. at 526.  In finding that legislative immunity/privilege did not preclude the

prosecution of Brewster under the bribery statute, the Supreme Court distinguished the necessary

criminal elements to be proven from the protected legislative acts:

> Taking a bribe is, obviously, no part of the legislative process or function; it is not
> a legislative act. It is not, by any conceivable interpretation, an act performed as a
> part of or even incidental to the role of a legislator. It is not an 'act resulting from
> the nature, and in the execution, of the office.' Nor is it a 'thing said or done by
> him, as a representative, in the exercise of the functions of that office,' Nor is
> inquiry into a legislative act or the motivation for a legislative act necessary to a
> prosecution under this statute or this indictment. When a bribe is taken, it does not
> matter whether the promise for which the bribe was given was for the
> performance of a legislative act as here or, as in Johnson, for use of a
> Congressman's influence with the Executive Branch. And an inquiry into the

---

[9] The statute at issue in *Brewster*  provided that a legislator who "corruptly asks, demands, exacts, solicits, seeks, accepts, receives, or agrees to receive anything of value . . . in return for . . . (1) being influenced in his performance of any office act" is guilty of an offense.  *Brewster*, 408 U.S. at 525-26 (quoting 18 U.S.C. §201(c)).

purpose of a bribe 'does not draw in question the legislative acts of the defendant member of Congress or his motives for performing them.'

*Id.* (citations omitted).

Applying the above Supreme Court jurisprudence on the Speech or Debate Clause, the Tenth Circuit in *Bastien* reversed the trial court's dismissal of plaintiff's employment discrimination claim against the employing office of Senator Ben Nighthorse Campbell ("Campbell") under the Congressional Accountability Act of 1995 ("CAA") based on the Speech or Debate Clause.  Plaintiff Rita Bastien ("Bastien") worked as an aide in Campbell's Englewood, Colorado office for six years. On September 5, 2000, Bastien, then 61, was transferred to Campbell's Colorado Springs office as a District Director.  Bastien alleged that Campbell's Office discriminated against her based on age and retaliated against her for discrimination complaints when it terminated her as District Director on April 10, 2001.  The trial judge granted Campbell's Office's motion to dismiss, finding that the majority of Bastien's job responsibilities were directly related to the due functioning of the legislative process, and thus, Campbell's Office was entitled to immunity under the Speech or Debate Clause.   *Bastien v. Campbell*, 209 F.Supp.2d 1095, 1106 (D.Colo. 2002).

The Tenth Circuit reversed, finding that "the alleged discriminatory acts by the Senator were not legislative acts," and "even if there had been a legislative act – say, a committee resolution – directing a discriminatory action against Plaintiff, only the vote itself would be protected by the Speech or Debate Clause."  *Id*. at 1315.   In so finding, the Tenth Circuit rejected Campbell's argument that the Supreme Court in *Doe, Eastland,* and *Hutchinson* indicated that the Speech or Debate Clause immunity extends to a legislator's or his aides' informal meetings with constituents or other members of the public "to the extent that

information is gathered that could affect his votes or his efforts to craft proposed legislation." *Id*. at 1316.  Specifically, the Tenth Circuit interpreted the "communicative processes" referred to in *Gravel* [10] as not extending to communication between legislators and their constituents or the public, only to "information gathering . . . in the course of formal committee action, when the committee had subpoenaed witnesses or disclosed information during a hearing." *Id*.; *but see Miller v. Transamerican Press, Inc.,* 709 F.2d 524, 530 (9th Cir. 1983) (The Speech and Debate Clause prohibits questions about a legislator's sources of information because the legislator's receipt of "information pertinent to potential legislation or investigation" is part of the privileged legislative process.); *Gov't of Virgin Islands v. Lee*, 775 F.2d 514, 521 (3d Cir. 1985) ("We agree that fact-finding, information gathering, and investigative activities are essential prerequisites to the drafting of bills and the enlightened debate over proposed legislation.")

Although the Tenth Circuit has very narrowly limited the "information gathering" that is privileged to that gathered "in the course of formal committee action," the Oklahoma Supreme Court appears to have interpreted legislative privilege under the Oklahoma Constitution for "the informing function"- the flip side of information gathering - more broadly in finding that a legislator's written version of his speech before the Senate attacking the "integrity and sincerity of the Criminal Court of Appeals of the State of Oklahoma . . . in connection with a murder

---

[10] The complete reference is to the following statement in *Gravel*:
Legislative acts are not all-encompassing. The heart of the Clause is speech or debate in either House. Insofar as the Clause is construed to reach other matters, they must be an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House.
*Gravel*, 408 U.S. at 625.

case" was privileged, although he deliver it to the press.  *Nix*, 295 P.2d at 288-91.  The

Oklahoma Supreme Court, however, was quick to point out that the state senator "made his

speech on the Senate floor and delivered press releases to newspaper men that the Senate was

then in session."   *Id*. at 291.  The state Supreme Court, nonetheless, did recognize the

importance of the "informing function of Congress," citing *Tenney* in support of its broad

reading of the Oklahoma Speech or Debate Clause:

> Legislators are immune from deterrents to the uninhibited discharge of their
> legislative duty, not for their private indulgence but for the public good. One must
> not expect uncommon courage even in legislators. The privilege would be of little
> value if they could be subjected to the cost and inconvenience and distractions of a
> trial upon a conclusion of the pleader, or to the hazard of a judgment against them
> based upon a jury's speculation as to the motives. The holding of this Court in
> Fletcher v. Peck, 6 Cranch 87, 130, 3 L.Ed. 162 [167], that it was not consonant
> with our scheme of government for a court to inquire into the motives of
> legislators, has remained unquestioned.  Investigations, whether by standing or
> special committees, are an established part of representative government.
> Legislative committees have been charged with losing sight of their duty of
> disinterestedness. In times of political passion, dishonest or vindictive motives are
> readily attributed to legislative conduct and as readily believed. Courts are not the
> place for such controversies. Self-discipline and the voters must be the ultimate
> reliance for discouraging or correcting such abuses. The courts should not be
> beyond the narrow confines of determining that a committee's inquiry may fairly
> be deemed within its province. To find that a committee's investigation has
> exceeded the bounds of legislative power it must be obvious that there was a
> usurpation of functions exclusively vested in the Judiciary or the Executive.

*Id*. at 291 (quoting *Tenney*, 341 U.S. at 377-78) (citation omitted).

It is, however, notable that *Nix* was decided before the United States Supreme Court

emphasized that although the Clause should be interpreted "broadly to effectuate its purposes,"

*Eastland*, 421 U.S. at 501, it should "not extend beyond what is necessary to preserve the

integrity of the legislative process," *Brewster*, 408 U.S. at 517.  Indeed, *Nix* was decided many

years before *Gravel* in which the United States Supreme Court required that a legislative act be

"an integral part of the deliberative and communicative processes by which Members participate

in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation," and concluded that Senator Gravel's effort to arrange for private publication of material he had included in the record of a subcommittee hearing was not an "integral part" of the legislative process. *Gravel*, 408 U.S. at 625. Thus, the Oklahoma Supreme Court's broader interpretation of legislative privilege in *Nix* was likely due to the difference in policy considerations in 1956 and in 1972, rather than any real difference in the United States Supreme Court's and the Oklahoma Supreme Court's respective interpretations of the federal and state Constitutions.

This reading is consistent with the 1997 *Brock* decision in which the Oklahoma Supreme Court cited with approval *Hutchinson v. Proxmire*, 443 U.S. 111, 133 (1979), in support of its legal statement that the "legislative privilege has never been limited to words spoken in debate." *Brock,* 948 P.2d at 288. The *Brock* Court characterized the holding in *Hutchinson* as follows: "in a libel suit against a United States senator the court held that the senator's press releases and newsletters were not protected by the Speech or Debate Clause." *Id* at 288 n.9. And in *Hutchinson*, the United States Supreme Court emphatically rejected identifying a legislator's informing the public or his constituency of the basis of his actions as a "legislative function":

> Respondents also argue that newsletters and press releases are privileged as part of the "informing function" of Congress. Advocates of a broad reading of the "informing function" sometimes tend to confuse two uses of the term "informing." In one sense, Congress informs itself collectively by way of hearings of its committees. It was in that sense that Woodrow Wilson used "informing" in a statement quoted by respondents. In reality, Wilson's statement related to congressional efforts to learn of the activities of the Executive Branch and administrative agencies; he did not include wide-ranging inquiries by individual Members on subjects of their choice. Moreover, Wilson's statement itself clearly implies a distinction between the informing function and the legislative function:
> "Unless Congress have and use every means of acquainting itself with the acts and the disposition of the administrative agents of the government, the country must be helpless to learn how it is being served; and unless Congress both

> scrutinize these things and sift them by every form of discussion, the country
> must remain in embarrassing, crippling ignorance of the very affairs which it is
> most important that it should understand and direct. The informing function of
> Congress should be preferred even to its legislative function. . . . [T]he only really
> self-governing people is that people which discusses and interrogates its
> administration."
>
> It is in this narrower Wilsonian sense that this Court has employed
> "informing" in previous cases holding that congressional efforts to inform itself
> through committee hearings are part of the legislative function.
>
> The other sense of the term, and the one relied upon by respondents,
> perceives it to be the duty of Members to tell the public about their activities.
> Valuable and desirable as it may be in broad terms, the transmittal of such
> information by individual Members in order to inform the public and other
> Members is not a part of the legislative function or the deliberations that make up
> the legislative process. As a result, transmittal of such information by press
> releases and newsletters is not protected by the Speech or Debate Clause.

*Hutchinson*, 443 U.S. at 132-133. The Court thus concludes that the Oklahoma Supreme Court's interpretation of the state Speech or Debate Clause mirrors that of the United States Supreme Court's interpretation of the federal Clause.

Finally, the Court addresses Lindley's argument that legislative privilege does not extend to document production as it is a privilege of non-evidentiary "use," not one of nondisclosure. As the United States Supreme Court has not yet addressed the question, courts are split as to what role, if any, legislative privilege plays in prohibiting the production of documents, especially in instances, like this, in which discovery is sought from a non-party legislator.

Courts persuaded by the policy argument for openness of the legislative process in a democracy generally find documents not privileged. *See Bastien*, 390 F.3d at 1306-07 (Emphasizing a more restrictive reading, the Tenth Circuit opined that the Speech or Debate Clause "should not be, and has not been, read to make members of Congress into a special class of citizens protected from suit (or prosecution) arising out of any activity that could assist in the performance of their official duties."); *Powell v. Ridge*, 247 F.3d 520, 524 (3rd Cir. 2001)

(legislative immunity is not "bottomed on confidentiality"); *In re Grand Jury*

*(Granite Purchases for State Capital-Grand Jury Subpoena No. 86-1),* 821 F.2d 946, 953 n. 4

(3d Cir.1987) ("Our precedents have suggested that the privilege is primarily one of

non-evidentiary use, not one of non-disclosure"); *In re Grand Jury Investigation,* 587 F.2d 589,

597 (3d Cir.1978) (reasoning that legislative privilege not designed to encourage confidences by

maintaining secrecy "for the legislative process in a democracy has only a limited toleration for

secrecy."); *Marylanders for Fair Representation, Inc. v. Schaefer,* 144 F.R.D.292, 301 n.

20.(D.Md.1992) (Legislative immunity does not extend to "certain types of documentation

offering a 'speech or debate-like' privilege.").

Courts, however, which stress the need to prevent interference in congressional business

and distraction of Members from their legislative duties tend to extend legislative privilege to

documents as well as "informal information gathering". *See Brown & Williamson Tobacco*

*Corp., v. Williams*, 62 F.3d 408, 420, 421 (D.C.Cir.1995) (holding documentary evidence can be

as revealing as oral communications and thus documents in the hands of congressional members

are discoverable "only if the circumstances by which they come can be thought to fall outside

'legislative acts' or the legitimate legislative sphere"); *MINPECO, S.A. v. Conticommodity*

*Servs., Inc.*, 844 F.2d 856, 860 (D.C.Cir. 1988) (protecting "the process by which a committee

takes statements and prepares them for publication"); *Miller*, 709 F.2d at 530-31 (legislator's

receipt of "information pertinent to potential legislation or investigation" is part of privileged

legislative process); *United Transportation Union v. Springfield Terminal Railway Company*,

132 F.R.D. 4, 6 (D.Me. 1990) (Permitting discovery of internal legislative communications

would cause a "significant entrenchment on legislative independence.").

To the extent Lindley is arguing that the legislative privilege can *never* prevent discovery

of documents in any way related to the legislative process, the Court disagrees.  Documents that

are "an integral part of the deliberative and communicative processes" by which legislators

participate in legislative or committee proceedings are clearly privileged.  *Gravel*, 408 U.S. at

625.  Although Senator Coffee cannot claim legislative privilege from producing all the

documents requested by the subpoena simply because they are in some way related to his duties

as a state legislator, if the documents are of matters which are "an integral part of the deliberative

and communicative processes" by which legislators participate in legislative or committee

proceedings, they are privileged.  If they are not, the senator must produce them.

## III.    Discovery requests

In light of the above, the Court now turns to Lindley's Requests for Production from

Senator Coffee.  As Senator Coffee is asserting a legislative privilege, it is his burden to establish

its applicability.  *Kamplain v. Curry County Board of Commissioners*, 159 F.3d 1248, 1251

(10th Cir. 1998) ("[G]overnment official seeking [legislative] immunity bears the burden of

showing that an exemption from personal liability is justified."); *Manzi v. DiCarlo*, 982 F.Supp.

125, 128 (E.D.N.Y.1997) ("The burden of justifying application of any privilege [specifically,

legislative privilege] falls upon the party seeking to invoke it."). Senator Coffee contends that all

of the requests impermissibly seek documents which, if they exist, would be an "integral part of

the legislative process in considering and enacting state law"; thus, they are privileged.

*Response*, p. 6 (Dkt. #115). Unfortunately, he offers nothing to support his position.

Pursuant to Rule 45(d)(2)(A) of the Federal Rules of Civil Procedure, Senator Coffee not

only is required to support his claim of legislative privilege "expressly," but he must "describe

the nature of the withheld documents, communications, or tangible things in a manner that,

without revealing information itself privileged or protected, will enable the parties to assess the

claim." Fed.R.Civ.P. 45(d)(2)(A).  However, he has presented no descriptions of the nature of the documents or a privilege log from which Lindley or the Court can determine the applicability of legislative privilege.   The statement in Senator Coffee's brief that all but one of the requests expressly refers to the "actual charge legislation" falls quite short of the requirements of Rule 45; and contrary to Senator Coffee's belief that the requested documents establish "by their own terms" that they are an "integral part of the legislative process," this Court apparently needs express guidance.  For instance, while the request for "[a]ll documents relating to, evidencing, memorializing or summarizing any drafts of, revisions to, or proposal language for, the Actual Charge Legislation," is obviously broad enough to include privileged documents, Senator Coffee has offered no explanation why documents allegedly given him by American Fidelity are likewise entitled to legislative privilege.

Accordingly, the Court directs Senator Coffee to produce to Plaintiff on or before August 10, 2009 all the requested documents not protected by legislative privilege (determined in light of the Court's analysis of the law set forth above) and to provide the Court and Plaintiff a privilege log of the documents he contends are privileged.  By that same date, Senator Coffee is to deliver the documents he purports to be privileged to the Court for its review.   According to the Local Rules for the Northern District of Oklahoma, the privilege log should include the following: "the type of document; the general subject matter of the document; the date of the document; the author of the document, whether or not the author is a lawyer; each recipient of the document; and the privilege asserted." LCvR26.4(a). "If information called for by one or more of the foregoing categories is itself privileged, it need not be disclosed."  LCvR26.4(b).

To assist Senator Coffee in determining what documents may be privileged, the Court offers the following summary of the "legislative acts" or matters that are "*an integral part of the*

*deliberative and communicative processes* by which Members participate *in committee and House proceedings* with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places with the jurisdiction of either House," and those acts or matters that are not privileged, as discussed above.

Items which are protected by legislative privilege include:

(1) "all formal actions in the official business of [the Oklahoma Senate], including voting, conducting hearings, issuing reports and issuing subpoenas";
(2) questioning witnesses in state investigative committee meetings;
(3) committee reports distributed within the Oklahoma Senate;
(4) votes to authorize committee investigations and the issuance of subpoenas in those investigations;
(5) Senator's floor speech, its preparation and motives for the speech;
(6) making, publishing, presenting and using legislative reports;
(7) introducing material at committee hearings;
(8) information gathering if in the course of formal committee action when the committee had subpoenaed witnesses or disclosed information during a hearing.

Contrarily, the following is a list of items *not* covered by legislative privilege:

(1) errands performed for constituents or other members of the public;
(2) making appointments with Government agencies;
(3) assistance in securing Government contracts;
(4) preparing "news letter" to constituents or other members of the public;
(5) news releases;
(6) speeches delivered outside the Senate;
(7) illegal acts;
(8) personal acts;
(9) promise to vote a certain way or give a speech at a future date;
(10) private publication of material included in the record of a subcommittee hearing;
(11) informal meetings with constituents or other members of the public.

The lists, of course, are not comprehensive.  They are guidelines to assist the Senator in making his determination.  Should Senator Coffee wish to submit a short brief (not to exceed 10 pages) offering authority for claim(s) of legislative privilege not listed above or in some way distinguishable, he may file it with the privilege log on August 10, 2009.  If Lindley wishes to file a response brief, he should notify the Court by the close of business on August 11, 2009 and

his brief (not to exceed 10 pages) will be due on or before August 14, 2009.  Otherwise, the

Court will consider the matter at issue on August 10, 2009, review the documents and issue its

ruling promptly.

      IT IS SO ORDERED, this 24th day of July, 2009.

Paul J. Cleary
United States Magistrate Judge