**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

DENNY LINDLEY,                          )
                                        )
                    Plaintiff,          )
                                        )
v.                                      )   Case No.    08-CV-379-CVE-PJC
                                        )
LIFE INVESTORS INSURANCE                )
COMPANY OF AMERICA,                     )
                                        )
                    Defendant.          )

**OPINION AND ORDER**

Before the Court is Plaintiff's Motion to Compel Documents Identified Nos. 1-386 on

Defendant's Consolidated Privilege Log (Dkt. #222); Plaintiff's Sixth Motion to Compel

Information Concerning Defendant's Knowledge and Consideration of "Actual Charges" (Dkt.

#156); Defendant's Motion for Protective Order from Request No. 40 of Plaintiff's Second

Requests for Production (Dkt. #181) and Plaintiff's Rule 56(F) Motion for an Enlargement of

Time to Respond to Defendant's Motion for Summary Judgment (Dkt. #209).  The Court heard

oral arguments on the motions on November 4 and 13, 2009.

Pursuant to the Court's order at the November 13th hearing, Defendant Life Investors

Insurance Company of America ("Life Investors")[1] produced for *in camera* review certain

documents listed in the Consolidated Privilege Log ("CPL") Document Nos. 1-386[2] on

_____

[1] Life Investors is now known as Transamerica Life Insurance Company ("Transamerica") since
the entities merged on October 2, 2008.  In the interest of clarity, the Court will refer to the Defendant as
Life Investors.

[2] The Consolidated Privilege Log ("CPL") consists of  Lindley's consolidation of the privilege
log Life Investors produced to Lindley, listing 164 documents (the "Lindley Log"), plus a privilege log in
another case, *Gooch v. Life Investors Insurance Company of America* (the "Gooch Log") listing ~200
documents.  Lindley contends that he included the Gooch Log in the CPL because the Gooch Log listed

November 20, 2009 (Dkt. #258).  And pursuant to Plaintiff Denny Lindley's ("Lindley") request in the Joint Status Report Regarding Defendant's Supplemental Privilege Log (Dkt. #273), the Court ordered the production for *in camera* review of documents listed on the Supplemental Privilege Log ("SPL") by December 8, 2009. (Dkt. #276).  As all of the requested documents have been produced either to Lindley or for the Court's *in camera* inspection,[3] the dispute over the unproduced documents listed in the Lindley Log and SPL is now at issue.  As the disposition of the motion to compel these documents and the motion to compel and for protective order regarding Plaintiff's Document Request No. 40 turns on some of the same claims of privilege and waiver, and, as Plaintiff contends that the resolution of all these motions determines whether the Court should grant his Rule 56(F) Motion for an Enlargement of Time to Respond to Defendant's Motion for Summary Judgment (Dkt. #209), the Court addresses all of the motions herein.

---

several hundred additional documents that were never disclosed to Lindley, although the *Gooch* case involved a similarly-situated policyholder litigating an identical "actual charges" case.  In response, Life Investors stated that some, but not all of documents listed in the Gooch Log were responsive to Lindley's requests and that it had inadvertently neglected to supplement the Lindley Log with the list of documents that were responsive.  Thus, Life Investors produced a supplemental privilege log listing those documents (the Supplemental Privilege Log ("SPL")). The Court has reviewed *in camera* the CPL documents 1-386 listed in the Lindley Log as well as those in the SPL.

[3] Life Investors withdrew its assertion of privilege as to LI-Priv Lindley 00171, 00172, 00174, 00178, 00179, 00180, 00182 on the SPL which were duplicates of documents listed on its first privilege log and produced to plaintiff on November 20, 2009, as well as LI-Priv Lindley 00259 (although the document is labeled "Attorney-Client Privileged").  It also withdrew its privilege assertion over the following documents in the CPL: LI-Priv-Lindley 0019, 0028, 0041, 0058, 0062, 0069, 0090, 0106, 0117, 0149. In addition, Life Investors has produced to Lindley the following redacted documents: LIPriv-Lindley 0016 (reissued as LIICA-003816); LIPriv-Lindley 0017 (reissued as LIICA-003818); LIPriv-Lindley 0018 (reissued as LIICA-003838); LIPriv-Lindley 0064 (reissued as LIICA-003995) and LIPriv-Lindley 0091 (reissued as LIICA-005187).

# I.   BACKGROUND [4]

On June 16, 1995, Lindley applied for and was issued a Cancer Only Supplemental Policy ("the Policy") by Bankers United Life Assurance Company ("Bankers United")[5], effective July 1, 1995.  The Policy offers unlimited benefits for chemotherapy and radiation treatment and is "guaranteed renewable for life" as long as the premiums are paid.  Lindley has paid the premiums on the Policy on a monthly basis since the effective date.

In October 2001, Lindley was diagnosed with cancer and began to submit claims for reimbursement of his medical expenses under the Policy.  From October 2001 to January 2006, Life Investors reimbursed Lindley for the full amount listed on his providers' bills.  On January 27, 2006, Life Investors notified Lindley that it was instituting a new claims-handling policy limiting Lindley's benefits under the Policy to the "actual charges" billed by his providers, which Life Investors construed as the amount "being paid to and accepted as payment by the healthcare provider."  *Lindley's Motion,* Ex. 17 (Dkt. #222).   Lindley refused to comply with the new claims procedure and continued to submit his providers' bills with the full amount of charges as he viewed Life Investors' change in claims-handling policy as an impermissible,

---

[4] In support of the factual statements in his motion to compel production of documents, Lindley cites the deposition testimony of various Life Investors' employees taken in other "actual charge" litigation: *i.e., Smith v. Life Investors Insurance Company of America*, No. 2:07-CV-681 (W.D.Pa.); *Belue v. Aegon USA Inc., Life Investors Insurance Company of America and Transamerica Life Insurance Company*, No. 7:08-CV-3830 (D.S.C.); *Pipes v. Life Investors Insurance Company of America*, No. 1:07-CV-35 (E.D.Ark).  Although Life Investors objects that Lindley's discussion of events in 2002 and 2003 is irrelevant, it also cites the deposition testimony in the above litigation to refute Lindley's account of events from 2004 through 2005.  The facts set forth herein are derived from the deposition testimony of Life Investors' employees in the above cases attached to the motion and response, the uncontested allegations set forth in the Petition, Answer and Counterclaim in Case No. 08-CV-379-CVE-PJC as well as those in Case No. 09-CV-429-CVE-PJC which was consolidated with this case, the undisputed facts set forth in Life Investors' summary judgment motion (Dkt. #185) and Lindley's motion for partial judgment on the pleadings (Dkt. #256), and the Court's rulings to date.

[5] Bankers United merged into Life Investors in December 2001.

3

unilateral change in the "actual charges" term of the Policy.  And thus this dispute arose.

As part of the history giving rise to this lawsuit,  Life Investors made a business decision to discontinue the sale of supplemental cancer policies like Lindley's that offered uncapped or unlimited benefits for chemotherapy and radiation treatment because of the rising costs of these treatments.  Because these uncapped cancer policies were guaranteed renewable for the insured's lifetime as long as premiums were paid, there still remained a substantial number of these undesirable policies on Life Investors' balance sheet.   This block of policies was referred to as the "Discontinued Supplemental Insurance ("DSI")" policies.

Due to the increasing loss ratio (claims paid/premiums collected) on these DSI policies, Life Investors imposed a 30% rate increase on the DSI policy premiums in 2000 and again in 2003.  Since 2002, Life Investors had been offering less expensive cancer policies with capped benefits to encourage policyholders to change policies.  The pool of policyholders within the closed book of DSI policies shrank, presumably after some policyholders exchanged their unlimited benefit policies for cheaper capped benefit policies; thus, the remaining pool became more dense with cancer patients "in claim," and the loss ratio on the DSI policies continued to increase.[6]  Thus, in 2004, Life Investors implemented another 30% premium rate increase.

As a result of the continuing rate increases, Kelly Adams ("Adams"), Vice-President and CFO of Life Investors, asked Steven Gwin ("Gwin"), an actuary with Life Investors, to head up a taskforce convened to consider possible solutions to avoid or mitigate the effect of rising premium rates on the DSI policies, *i.e.*, the "DSI Taskforce."  The DSI Taskforce was convened in April 2004 and included Life Investor officers and employees from the financial, actuarial,

---

[6]  This is referred to in the insurance industry as a "death spiral."

4

claims and legal departments who undertook a comprehensive review of the problem, meeting once or twice a week for approximately 15 months.

After completing its initial review, the DSI Taskforce concluded that the term "actual charges" in the DSI policies meant that Life Investors was required to pay only the discounted amounts actually paid the health providers by third-party payors, such as health insurers, rather than the billed or list charges submitted by the health providers, the amount of benefits Life Investors had been paying its policyholders' claims for chemotherapy and radiation treatments. After receiving approval from upper management to focus on this proposed change in the interpretation of "actual charges,"[7] Mark Edwards ("Edwards"), Life Investors' Assistant General Counsel and a member of the DSI Taskforce, consulted with outside counsel from May through October 2004 regarding various issues related to the proposed change.  And in late October 2005, Life Investors retained the law firm of Jorden Burt LLP ("Jorden Burt") to provide a legal opinion on the proposed change. Sometime in April 2005, Jorden Burt provided Life Investors with a 185-page report.

In July 2005, Life Investors formed a team of employees tasked with updating its claims forms and procedures to implement the change in "actual charges."  This group, which included Edwards, was referred to as the "Supplemental Insurance Claims Project Team" or "Project Team."  As a result of this process, Connie Whitlock ("Whitlock"), Life Investors' Senior Vice-President, mailed a letter to all DSI policyholders, including Lindley, notifying them of the

_____

[7] Life Investors continues to assert that it did not change its interpretation of "actual charges"; rather, it changed its claim procedures.  Chief Judge Claire V. Eagan, however, in her July 17, 2009 Opinion and Order, rejected Life Investors' strategic characterization:  "While defendant may call this a revision in claim procedures, it also reflects a change in its interpretation of 'actual charges.'" July 17, 2009 Opinion and Order, p. 12 (Dkt. #140).

proper calculation of "actual charges" and that they were to submit the Explanation of Benefits

("EOB") from their health insurer as proof of claim, rather than the health providers' billed

costs.

## II.   APPLICABLE LAW

Rule 26(b)(1) of the Federal Rules of Civil Procedure provides for discovery "regarding

any matter, *not privileged*, that is relevant to the claim or defense of any party" or discovery of

any information that "appears reasonably calculated to lead to the discovery of admissible

evidence." Fed.R.Civ.P. 26(b)(1) (emphasis added).  By excluding privileged information from

the broad sweep of discovery, Rule 26 tries to strike a balance between promoting the truth-

seeking goal of discovery and the purpose of the stated privilege.

In response to Lindley's motions to compel and in support of its own motion for

protective order, Life Investors asserts that all the documents Lindley seeks are protected from

discovery by the attorney-client privilege, attorney work product doctrine and/or the "self-

critical analysis" privilege.  The Court gives short-shrift to Life Investors' assertion of the self-

critical analysis privilege.  This privilege "allows individuals or businesses to candidly assess

their compliance with regulatory and legal requirements without creating evidence that may be

used against them by their opponents in future litigation." *Reichhold Chems., Inc. v. Textron,*

*Inc.*, 157 F.R.D. 522, 524 (N.D.Fla.1994).  Life Investors has offered no Oklahoma or Tenth

Circuit authority recognizing this privilege and the Court declines to do so.  Accordingly, the

Court focuses its discussion on attorney-client privilege and attorney work product protection as

limitations on discovery.

Although similar in some ways, the differences between attorney-client privilege and

attorney work product arise in large part from their different purposes.  The purpose of the attorney-client privilege is to encourage "clients to make 'full and frank' disclosure to their attorneys, who are then better able to provide candid advice and effective representation". *Mohawk Industries, Inc. v. Carpenter*, _ U.S. _, 130 S.Ct. 599, 606 (2009) (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)).  The goal of the attorney work product doctrine is to protect "an attorney's subjective analysis and substantive efforts in, or in anticipation of, litigation from use by the adverse party." *Adams v. Gateway, Inc.,* 2003 WL 23787856, at *8 (D.Utah).  However, because all privileges are "in derogation of the search for truth," both are narrowly construed.  *United States v. Kapnison*, 743 F.2d 1450, 1456 (10th Cir. 1984) (citing *United States v. Nixon*, 418 U.S. 683 (1974)); *In re Qwest Communications Intern. Inc.*, 450 F.3d 1179, 1185 (10th Cir. 2006) (Privileges "must be strictly construed and accepted 'only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth.' "); *Sanchez v. Matta*, 229 F.R.D. 649, 655 (D.N.M. 2004) ("The attorney-client privilege is a narrow one and was not intended to be a catch-all exception to a process of broad and liberal discovery.").  Thus, the party asserting attorney-client privilege or work-product protection has the burden of clearly showing that either or both apply. *Accounting Principals, Inc. v. Manpower, Inc.*, 2009 WL 2252123, at *3 (N.D.Okla.); *see also Barclays-American Corporation v. Kane*, 746 F.2d 653, 656 (10th Cir.1984); *Peat, Marwick, Mitchell & Co. v. West*, 748 F.2d 540, 542 (10th Cir.1984).

In a diversity case such as this, issues related to the attorney-client privilege are controlled by state law, while claims of attorney work product are matters of federal law.

*Frontier Refining, Inc. v. Gorman-Rupp Co., Inc.*, 136 F.3d 695, 702 n.10 (10th Cir. 1998).

**A.      Attorney-Client Privilege and Implied "At Issue" Waiver**

The attorney-client privilege, codified at Okla. Stat. tit. 12, §2502, protects communications between an attorney and the client "who consults an attorney with a view towards obtaining legal services or is rendered professional legal services by an attorney." Okla. Stat. tit. 12, §2502(A)(2).[8]  It protects not only the client's confidential communications but also the attorney's responsive communications that reveal the content of the client's communications. This is sometimes referred to as the attorney's "derivative protection."  PAUL R. RICE, 1 ATTORNEY-CLIENT PRIVILEGE IN THE UNITED STATES, § 5:14 (Thomson West 2d ed.1999) (footnotes omitted) (hereafter, "Rice").  "In order to establish the privilege, it must be shown that the status occupied by the parties was that of attorney and client and that their communications were of a confidential nature." *Chandler v. Denton,* 741 P.2d 855, 865 (Okla. 1987).  And the

---

[8]  The Oklahoma statute defines the terms therein as follows:
> 1. An "attorney" is a person authorized, or reasonably believed by the client to be authorized, to engage in the practice of law in any state or nation;
> 2. A "client" is a person, public officer, or corporation, association, or other organization or entity, either public or private, who consults an attorney with a view towards obtaining legal services or is rendered professional legal services by an attorney;
> 3. A "representative of an attorney" is one employed by the attorney to assist the attorney in the rendition of professional legal services;
> 4. A "representative of the client" is one having authority to obtain professional legal services, or to act on advice rendered pursuant thereto, on behalf of the client; and
> 5. A communication is "confidential" if not intended to be disclosed to third persons other than those to whom disclosure is made in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication, action and concerning a matter of common interest therein; . . .

Okla. Stat. tit. 12, §2502(A).

confidential communications must be "made for the purpose of facilitating the rendition of professional legal services to the client." Okla. Stat. tit. 12, §2502(B).[9]  Thus, the "communication between the lawyer and client must relate to legal advice or strategy sought by the client."  *United States v. Johnston*, 146 F.3d 785, 794 (10th Cir. 1998) (applying Oklahoma law); *In re CFS-Related Securities Fraud Litigation*, 223 F.R.D. 631, 635 (N.D. Okla. 2004) ("Generally communications between a lawyer and the lawyer's client for the purpose of obtaining legal advice is a privileged communication which is protected by the legal process.").

Most disputes as to the applicability of the privilege pivot on whether the confidential communication was made for the purpose of seeking or providing legal advice.  What makes advice "legal"?   The answer is not as simple as identifying a lawyer as the recipient of a client's confidential communication. *Motley v. Marathon Oil Co.*, 71 F.3d 1547, 1550-51 (10th Cir. 1995), *cert. denied*, 517 U.S. 1190 (1996) ("[T]he mere fact that an attorney was involved in a communication does not automatically render the communication subject to the attorney-client

---

[9]     This privilege extends to representatives of the client and lawyer, as well:

B.     A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client:

1.     Between the client or a representative of the client and the client's attorney or a representative of the attorney;

2.     Between the attorney and a representative of the attorney;

3.     By the client or a representative of the client or the client's attorney or a representative of the attorney to an attorney or a representative of an attorney representing another party or a representative of an attorney representing another party in a pending action and concerning a matter of common interest therein;

4.     Between representatives of the client or between the client and a representative of the client; or

5.     Among attorneys and their representatives representing the same client.

Okla. Stat. tit.12, § 2502(B) (2002).

privilege."); *Scott v. Peterson*, 126 P.3d 1232, 1234 (Okla. 2005) ("Generally, the mere status of

an attorney-client relationship does not make every communication between attorney and client

protected by the privilege.").  Although the "status" of lawyer is one of the Court's

considerations in determining the nature of the advice, the Court must consider the context of or

circumstances surrounding the communication.

Many courts have relied on two rebuttable presumptions (though often not stated

expressly) regarding the role of the lawyer in determining the nature of the advice: (1) if outside

counsel is involved, the confidential communication is presumed to be a request for and the

provision of "legal advice"; and (2) if in-house counsel is involved, the presumption is that the

attorney's input is more likely business than legal in nature.  As a result, most of these courts

apply "heightened" scrutiny to communications to and from in-house counsel in determining

attorney-client privilege:

> [U]nlike the situation where a client individually engages a lawyer in a particular
> matter, staff attorneys may serve as company officers, with mixed business-legal
> responsibility; whether or not officers, their day-to day involvement in their
> employers' affairs may blur the line between legal and nonlegal communications;
> and their advice may originate not in response to the client's consultation about a
> particular problem but with them, as part of an ongoing permanent relationship
> with the organization. In that the privilege obstructs the truth-finding process and
> its scope is limited to that which is necessary to achieve its purpose, the need to
> apply it cautiously and narrowly is heightened in the case of corporate staff
> counsel, lest the mere participation of an attorney be used to seal off disclosure.

*Rossi v. Blue Cross and Blue Shield of Greater New York*, 540 N.E.2d 703, 705 (N.Y. 1989); *see

also Neuder v. Battelle Pacific Northwest Nat. Lab.*, 194 F.R.D. 289, 295 (D.D.C. 2000);

*Neuberger Berman Real Estate Income Fund, Inc. v. Lola Brown Trust No. 1B*,  230 F.R.D. 398,

411 n. 20 (D.Md. 2005) ("While courts state that they do not intend to weaken the privilege [by

imposing a "higher burden on in-house counsel to 'clearly demonstrate'" that counsel was giving

10

legal advice], they are mindful that corporate clients could attempt to hide mountains of otherwise discoverable information behind a veil of secrecy by using in-house legal departments as conduits of otherwise unprivileged information."); *Marten v. Yellow Freight System, Inc.*, 1998 WL 13244, at *6 (D.Kan.) ("Although such status does not alter the attorney/client privilege ... when the attorney serves also in another capacity, such as vice president, his advice is privileged 'only upon a clear showing' that it was given in a professional legal capacity.").[10]

As one commentator noted:

> The status of the attorney is an important factor in determining the underlying purpose of the communication. For example, the unstated operating presumption in situations involving outside retained counsel with limited responsibilities to the client (e.g., strictly legal capacity as opposed to business responsibilities because of a corporate position that he holds), is that the consultations were held for the purpose of obtaining legal advice or assistance. The same presumption does not apply to in-house counsel because of the many nonlegal responsibilities in-house counsel assumes (whether given a separate position and title or not).  Courts have held that communications to and from in-house counsel can be sheltered "only upon a clear showing that [in-house counsel] gave [advice] in a professional legal capacity."

Rice, *supra*, at § 7:1 (footnotes omitted).  The rationale for the presumptions regarding the use of outside or in-house counsel is that outside counsel generally has many different clients and is typically engaged for the singular role of providing legal advice, while in-house counsel only has one client - the corporation for whom he or she works - and is engaged in a dual role of providing both legal and business advice to the corporation.

Neither is the answer to "What makes advice 'legal'?" a simple question of content.

---

[10]  It has however been argued that this "bias" against in-house counsel and corporations is unfounded and the standard to be applied in determining attorney-client privilege should be the same for in-house and outside counsel.  Grace M. Giesel, *The Legal Advice Requirement of the Attorney-Client Privilege: a Special Problem for In-House Counsel and Outside Attorneys Representing Corporations*, 48 Mercer L. Rev. 1169 (Spring 1997).

Privileged material has been defined as "(I) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding." *United States v. United Shoe Machinery Corp.*, 89 F.Supp. 357, 358-59 (D.Mass. 1950); *Great Plains Mut. Ins. Co., Inc. v. Mutual Reinsurance Bureau*, 150 F.R.D. 193, 196 (D.Kan. 1993). It has been limited only to the litigation context. *See* Geoffrey C. Hazard, Jr., *A Historical Perspective on the Attorney-Client Privilege*, 66 Cal.L.Rev. 1062 (1978). On the other end of the spectrum it has been broadly defined as communication "for the purpose of obtaining or providing *legal assistance* for the client," *i.e.*, "if the lawyer's professional skill and training would have value in the matter." Restatement (Third) of The Law Governing Law. §§ 68 and 72, cmt.b (2000) (emphasis added). And further complicating matters is that the nature of "legal advice" or "legal services" is ever evolving:

> In pursuing large and complex financial transactions, commercial entities often seek the assistance of attorneys who are well equipped both by training and by experience to assess the risks and advantages in alternative business strategies. When providing this assistance, counsel are not limited to offering their client purely abstract advice as to the rules of law that may apply to their situation. Of necessity, counsel will often be required to assess specific tactics in putting together transactions or shaping the terms of commercial agreements, and their evaluation of alternative approaches may well take into account not only the potential impact of applicable legal norms, but also the commercial needs of their client and the financial benefits or risks of these alternative strategies.

*Note Funding Corp. v. Bobian Investment Co., N.V.,* 1995 WL 662402, at *2 (S.D.N.Y.1995).

What is clear is that the determination is fact-driven. In making its determination herein, the Court has not applied the presumptions regarding the status of the attorney (whether in-house or outside counsel). Rather, the Court considers the status of the attorney is one of many factors in determining whether the communication at issue was made for the purpose of seeking or providing legal advice." Further, in light of the narrow construction of attorney-client privilege due to its "derogation of the search for truth," the Court is unwilling to adopt a scope of privilege

as broad as that in the Restatement.  Other than those two general principles, the Court considers the status of the attorney, the nature of the advice given, the context, content and purpose of the communication, in determining whether the communication is for the purpose of seeking or providing legal advice.

In so doing, the Court adopts the following guidelines.  (1) If the attorney is providing business advice to the client, even if resulting from a confidential request, no attorney-client privilege attaches to the communication. *See CFS-Related Securities Fraud*, 223 F.R.D. at 635 (Although the privilege may be invoked by a corporate client, "communications between a lawyer and the lawyer's client for the purpose of obtaining legal advice is a privileged communication which is protected by the legal process.").[11]  (2) If an attorney is providing legal advice to the client at the client's request, the attorney-client privilege protects the confidentiality of the client's communication as well as the legal advice as it pertains to the

---

[11]  As one commentator noted, on one end of the corporate spectrum are communications solely seeking legal advice, which are clearly privileged, while -

> [a]t the other end of the spectrum are communications with corporate counsel seeking only business advice. These communications are just as clearly not privileged. "[T]he mere fact that an attorney was involved in a communication does not automatically render the communication subject to the attorney-client privilege." In-house counsel's mere presence at a meeting likewise does not shield otherwise unprivileged communications from disclosure. Where in-house counsel is acting as business negotiator, general business agent, preparer of tax returns, lobbyist, public relations strategist, or press agent, the privilege does not apply. That is, where businesses use their attorneys for non-legal purposes to promote the interests of the corporation, their communications are not protected by the privilege. Similarly, attorneys asked to provide a synopsis of prior legal proceedings to corporate executives have been held not to be acting in their legal capacity when doing so. "[C]ommon sense tells us that there is a difference between merely providing legal information and providing legal 'advice.' …. [T]he attorneys were acting more as 'courier[s] of factual information,' rather than 'legal advisers.' "Documents created for business reasons do not become privileged simply because they are tendered to in-house counsel.

John K. Villa, *The Attorney-Client Privilege and In-House Corporate Counsel*, 1 Corporate Counsel Guidelines §1:16 (2009) (footnotes omitted).

client's confidential communication.  *See Pacific Gas and Electric Co. v. United States*, 69 Fed.Cl. 784, 811 (Fed.Cl. 2006) ("The attorney-client privilege only affords protection to confidential communications seeking or rendering legal, rather than business, advice.").  (3) If the communication involves both business and legal issues, the Court must determine the primary or predominant purpose of the communication.  (a) If primarily a business purpose, the privilege does not attach and the document must be produced.[12]  *Neuberger Berman*, 230 F.R.D. at 411 ("[W]hen the legal advice is merely incidental to business advice, the privilege does not apply.").  (b) If primarily a legal purpose and the business portions of the document or communication are distinct and severable and their disclosure would not indirectly reveal the substance of the protected legal portion, the document - redacted of the privileged portions - should be produced.  *Scott*, 126 P.3d at 1234 ( "When only a part of a communication between attorney and client is privileged and if the privileged and unprivileged parts may be safely separated, then the privileged matter only will be excluded.").  (c) Where, however, the legal and

---

[12]  Rice explains that while "courts agree on the requirement that legal advice must be the client's *primary* purpose for consulting an attorney" to be protected from discovery, there are two views as to the focus of the standard: "The first focuses on the *instrument of communication* and looks to the primary purpose for the communication.  The second view focuses on the *segregable portions of a communication* – attempting to identify the purpose behind each." Rice, *supra*, at §7.6 (emphasis added).

The Court is of the first view.  The second view, in practice, would entirely vitiate the "primary purpose" standard.  For instance, if the second view were adopted, the Court could identify a document ("the instrument of communication") as having a primarily business purpose, but instead of then finding the entire document discoverable, the Court would redact any segregable portion of the document that contains legal advice.  An example of the second view is *United States v. Chevron Corp.*, 1996 WL 444597 (N.D.Cal.).  In *Chevron*, the parties moved for clarification of the court's conclusion that it was Chevron's burden to demonstrate "that the *primary purpose* of each document was the production of legal advice."  *Id*. at *1 (emphasis in original).  The court explained that its use of the word "document" did not "negate the privilege as to the portion containing requests for legal advice."  *Id*. at *2.  In other words, "despite the overall nature of the document, the client may assert the attorney-client privilege over isolated sentences or paragraphs within a document."  *Id*.  If this were the case, why would the court make any determination of the primary purpose of the document, *i.e.*, whether primarily business or legal, the segregable legal portions would be redacted.

business purposes of the communication are inextricably intertwined, the entire communication

is privileged only if the legal purpose outweighs the business purpose.  *See Picard Chemical Inc.*

*Profit Sharing Plan v. Perrigo Co.*, 951 F.Supp. 679, 685-86 (W.D.Mich.1996) (Legal and

business considerations may frequently be inextricably intertwined when legal advice is rendered

in the corporate context, but the fact that business considerations are weighed in the rendering of

legal advice will not vitiate the attorney-client privilege.);  *Neuder,*  194 F.R.D. at 292 ("[W]here

business and legal advice are intertwined, the legal advice must predominate for the

communication to be protected.").

     To establish that the Lindley log and SPL documents marked attorney-client privileged

are indeed protected from discovery, it is Life Investors' burden to show the following:

> (1) A communication; (2) that was intended to be confidential, and either;
> (3) from one seeking legal advice or assistance, and; (4) to one reasonably
> believed to be an attorney at law, or (3) from an attorney; (4) giving requested
> legal advice or assistance; (5) which reveals a prior confidential communication
> from the client.

Rice, *supra*, at § 11.9.  Once these elements are established, Life Investors then must establish

that the privilege has not been waived.  *Western Resources, Inc. v. Union Pacific Railroad Co.*

2002 WL 181494, at *4 (D.Kan.) (Because lack of waiver is generally considered an element of

the privilege, the proponent of the privilege also has the burden to establish lack of waiver.);

Edna S. Epstein, The Attorney-Client Privilege and the Work-Product Doctrine 1176 (American

Bar Assoc. 5th ed. 2007).  Thus, it is Life Investors' burden to establish that the documents are

privileged and that it has not waived its privilege.

     Lindley asserts that even if attorney-client privilege is established for the documents so

labeled on its privilege logs, Life Investors waived the privilege because it implicitly placed the

documents at issue by suing him based upon the reasonableness of Life Investor's counsel's advice. This theory of waiver of attorney-client privilege is referred to as "implied" or "at issue" waiver. *Roesler v. TIG Ins. Co.,* 251 Fed.Appx. 489, 500 (10th Cir.2007) ("[W]hen such advice becomes at issue in a legal proceeding . . . the client may be required to disclose the advice of counsel under a theory of implied waiver.") (applying Oklahoma law) (emphasis omitted). The doctrine of "at issue" waiver, either express[13] or implied, recognizes that attorney-client communications cannot be used "as both a sword and a shield." *Motley*, 71 F.3d at 1552.

The three factors applied to determine whether the proponent of the privilege has placed certain documents "at issue"; that is, whether the proponent has waived an otherwise applicable privilege through some affirmative act are:

1.   Whether the assertion of the privilege is the result of some affirmative act, such as filing suit or asserting an affirmative defense, by the asserting party.
2.   Whether the asserting party, through the affirmative act, put the protected information at issue by making it relevant to the case.
3.   If the privilege was applied, would it deny the opposing party access to information that was vital to the opposing parties defense.

*Cardtoons, L.C. v. Major League Baseball Players Assoc.*, 199 F.R.D. 677, 681 (N.D.2001) (citing *Hearn v. Rhay*, 68 F.R.D. 574, 580 (E.D.Wash.1975)); *Frontier Refining*, 136 F.3d at

---

[13] Express "at issue" waiver occurs when a party relies on the defense of "advice of counsel." In the context of bad faith insurance litigation, the advice of counsel defense provides that "when an insurer's actions are in conformity with advice given to it by counsel, the insurer's actions are taken in good faith, and thus the essential element that an aggrieved insured must demonstrate in establishing insurer bad faith is nullified." James M. Fischer, *Should Advice of Counsel Constitute a Defense for Insurer Bad Faith*, 72 Tex.L.Rev. 1447, 1461-62 (1994). Accordingly, if asserted as a defense, the insurer waives its attorney-client privilege as to all related communications and makes its counsel's work product vulnerable to discovery. *Minnesota Specialty Crops, Inc. v. Minnesota Wild Hockey Club, L.P.*, 210 F.R.D. 673, 675-676 (D.Minn. 2002) ("'Because the attorney client privilege and the work product doctrine have different standards of waiver, they must be considered separately, . . . [and] the waiver of its [work product] protections may be more limited in scope.").

700-701 (applying *Hearn* test and rejecting "'automatic waiver' rule which provides that a litigant automatically waives the privilege upon assertion of a claim, counterclaim, or affirmative defense that raises as an issue a matter to which otherwise privileged material is relevant").[14]

## B.    Attorney Work-Product Protection and Waiver

Attorney work product  is governed by the federal standard set forth in Rule 26(b)(3) of the Federal Rules of Civil Procedure.[15]  *Frontier Refining*, 136 F.3d at 702 n.10.  A party seeking work product immunity under Rule 26(b)(3) must establish that the materials are  (1) "documents and tangible things;" (2) "prepared in anticipation of litigation or for trial;" (3) "by or for another party or by or for that other party's representative." *Feldman v. Pioneer Petroleum, Inc.*  87 F.R.D. 86, 88 (W.D.Okla.1980) (quoting 8 Wright and Miller, Federal Practice and

---

[14] The *Frontier Refining* court also discussed the most restrictive test under *Rhone-Poulenc Rorer, Inc. v. Home Indem. Co.,* 32 F.3d 851, 863 (1994), that a litigant waives the attorney-client privilege if and only if, the litigant directly puts the attorney's advice at issue in the litigation; *i.e.*, "the advice of counsel is placed in issue where the client asserts a claim or defense, and attempts to prove that claim or defense by disclosing or describing an attorney client communication." *Frontier Refining*, 136 F.3d at 699-700.  The Tenth Circuit, however, found that it did not have to determine whether *Hearn* or *Rhone-Poulenc* would be the test Wyoming would apply because it found that there was no waiver under the less restrictive [*Hearn*] view. *Id*. at 701.

[15]  Rule 26(b)(3) provides:
(3) Trial Preparation: Materials.
(A) Documents and Tangible Things. Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent). But, subject to Rule 26(b)(4), those materials may be discovered if:
        (i) they are otherwise discoverable under Rule 26(b)(1); and
        (ii) the party shows that it has substantial need for the materials to
        prepare its case and cannot, without undue hardship, obtain their
        substantial equivalent by other means.
(B) Protection Against Disclosure. If the court orders discovery of those materials, it
must protect against disclosure of the mental impressions, conclusions, opinions, or legal
theories of a party's attorney or other representative concerning the litigation.
Fed.R.Civ.P. 26(b)(3).

Procedure: Civil § 2024 at 196-197).  Rule 26(b)(3) incorporates a two-tier protection of work product.  The discovering party may overcome what is referred to as "ordinary work product" or "factual work product" protection of "documents and tangible things" if it establishes a "substantial need" for the materials and an inability "without undue hardship to obtain the substantial equivalent of the materials by other means."  Fed.R.Civ.P. 26(b)(3).  However, the Rule instructs that opinion work product, that is, "the mental impressions, conclusions, opinions, or legal theories" of the attorney, requires heightened or special protection.  *Hoffman v. United Telecommunications, Inc.*, 117 F.R.D. 436, 439 (D.Kan.1987) ("This doctrine provide[s] an almost absolute protection for an attorney's mental impressions and conclusions.").

The proponent of the work-product claim has the burden of establishing the protection. *Peat, Marwick*, 748 F.2d at 542; *Sanchez*, 229 F.R.D. at 654.  Establishing work-product protection often depends on a showing that there was a reasonable threat of litigation and that the threat was the motivation for creating the document(s) in question. Epstein, *supra,* at 825; *United States ex rel. Fago v. M&T Mortgage Corp.*, 238 F.R.D. 3, 6 (D.D.C. 2006) ("'In anticipation of litigation' contains two related, but nevertheless distinct, concepts. One is temporal.  The other is motivational.").  Courts sometimes address this last issue in terms of a party's "primary motivation" for creating documents.  *Id*. at 854; *see Sanchez,* 229 F.R.D. at 655 ("Litigation need not necessarily be imminent as long as the primary motivating purpose behind the creation of the document was to aid in possible future litigation."); *Marten*, 1998 WL 13244, at *10 (quoting *EEOC v. GMC*, 1988 WL 170448, at *2 (D.Kan. Aug.23, 1988)). "Materials assembled in the ordinary course of business or for other non-litigation purposes are not protected by the work product doctrine. The inchoate possibility, or even likely chance of litigation, does not give rise

18

to work product." *Ledgin v. Blue Cross & Blue Shield*, 166 F.R.D. 496, 498 (D.Kan.1996) (citations omitted).

A key inquiry is whether the documents would have been created "*regardless* of whether litigation was in the offing." Epstein, *supra*, at 855 (emphasis added). In other words, "the anticipation of future litigation must have been the primary motivation which led to the creation of the documents." *Allendale Mut. Ins. Co. v. Bull Data Systems, Inc.*, 152 F.R.D. 132, 136 (N.D.Ill.1993). While the litigation need not be ongoing or imminent, "the primary motivating purpose behind the creation of a document or investigative report must be to aid in possible future litigation." *Janicker v. George Washington University*, 94 F.R.D. 648, 650 (D.D.C.1982). In sum, "[d]ocuments which do not refer to work product prepared by an attorney or other agent of a party to aid in forthcoming litigation, and which were generated in the ordinary course of business, are discoverable." *Allendale Mut. Ins.*, 152 F.R.D. at 136.

Work-product protection may also be waived. *United States v. Nobles*, 422 U.S. 225, 239 (1975). The majority view is that the party claiming waiver has the burden of proof on that issue. *Johnson v. Gmeinder*, 191 F.R.D. 638, 643 (D.Kan. 2000) (Party asserting waiver of work-product immunity, rather than the party asserting the work-product protection, should have the burden to establish waiver.); *Maldonado v. New Jersey ex rel. Admin. Office of the Courts – Probation Div.*, 225 F.R.D. 120, 132 (D.N.J. 2004); *S.E.C. v. Buntrock*, 217 F.R.D. 441, 447 (N.D.Ill. 2003); *Ferko v. National Ass'n for Stock Car Auto Racing, Inc.*, 218 F.R.D. 125, 136 (E.D.Tex. 2003); *Monsanto Co. v. Aventis Cropscience, N.V.*, 214 F.R.D. 545, 546 (E.D.Mo. 2002). A party claiming waiver of work-product protection can succeed by satisfying a two-part test: (1) the party must establish principles of law from which a court can conclude that waiver

is proper; and (2) the party must establish the facts necessary to find waiver under those legal principles. *Gmeinder*, 191 F.R.D. at 644.

Generally, waiver of work-product protection occurs "when the covered materials are used in a manner that is inconsistent with the protection." *Bank of America, N.A. v. Terra Nova Ins. Co.*, 212 F.R.D. 166, 170 (S.D.N.Y. 2002). Lindley is claiming Life Investors waived protection of its attorney work product under two theories - "at issue" waiver and subject matter waiver. "At issue" or implied waiver can occur by implication, as noted above, when a party injects the substance of work-product into litigation. *Frontier Refining*, 136 F.3d at 704. Waiver also occurs when a party makes a partial disclosure of work-product while seeking to maintain protection of work-product related to the same subject, otherwise known as "subject matter" waiver. *Hollinger Intern., Inc. v. Hollinger, Inc.*, 230 F.R.D. 508, 516 (N.D. Ill. 2005). And, unlike waiver of attorney-client privilege, it is the burden of the party who claims waiver to establish both a legal and factual basis for work-product waiver. *Gmeinder*, 191 F.R.D. at 644; *Monsanto*, 214 F.R.D. at 546.

## C.   The Intersection of Attorney-Client Privilege and Attorney Work Product in Discovery Analysis

Whether attorney-client privilege or attorney work product protects certain information from discovery often turns on the same set of facts and, consequently, courts frequently merge their analyses. This occurs when the pertinent inquiry is whether the confidential advice that is sought or given is primarily or predominantly "business" rather than "legal" in nature, which generally occurs when the "primary motivation" for creating a document is for a "business" rather than "litigation" purpose. And such is the case here as the origins of the communications/documents involved in the court's *in camera* review are the committee projects assigned to the DSI Taskforce and the Project Team, respectively. Not surprisingly, most of Life Investors' objections to the

20

discovery of the documents at issue are based on both attorney-client privilege and attorney work product.

## III.   ANALYSIS

**A.    Plaintiff's Motion to Compel Documents Identified Nos. 1-386 on Defendant's Consolidated Privilege Log (Dkt. #222)**

Lindley challenges Life Investors' claims that the documents on the Lindley Log and SPL are protected from discovery by attorney-client privilege, attorney work product and/or the "self-critical analysis."  He organizes his challenge into three categories: (1) documents relating to or created by the DSI Taskforce; (2) communications between the DSI Taskforce and outside counsel; and (3) documents relating to or created by the Project Team.  He asserts that the documents relating to or created by the DSI Taskforce were drafted and circulated among the members of the DSI Taskforce in the performance of the ordinary business function of an insurance company to determine how to minimize the loss ratio on a closed block of business and to contain premium rates for its policyholders.  He argues that the fact that some of the taskforce members were in-house counsel in Life Investors' legal department does not blanket these documents with the protection of the attorney-client privilege or work product.  Neither are the documents generated in communication with outside counsel, including Jorden Burt's "coverage" analysis, privileged or protected from discovery as they involve attorney communications in connection with the ordinary business function of determining insurance coverage.  Further he contends that Life Investors cannot now claim it was anticipating litigation during this period as its decision-makers have testified that they believed that "actual charges" was unambiguous and reducing premium costs was beneficial to the remaining pool of policyholders.  Similarly, Defendant's decision-makers have admitted that the design and

implementation of the new claim procedures were not prepared "in anticipation of litigation" and the documents resulting from this process are ordinary business functions of an insurance company, namely, implementing computer systems claims handling procedures. Finally, Lindley asserts that the "self-critical analysis" privilege is not recognized under Oklahoma law.

If, however, the Court finds that any of the listed documents are privileged, Lindley asserts that Life Investors has impliedly waived that privilege because it has sued Lindley for monetary and declaratory relief based on the claims that its decision was reasonable and in good faith and Lindley breached the Policy and in bad faith for failing to submit proper proofs of loss and thereby withholding documents and information regarding the actual expenses and loss incurred in an effort to deceive and mislead Life Investors as to real actual charges.  Life Investors has also waived any work product protection because its coverage counsel drafted a self-serving piece of work product that was given to Whitlock to disseminate throughout the Company; *i.e.*, the "Whitlock Memo."  Lindley asserts that Life Investors cannot selectively disclose protected work product to prove its good faith yet prevent him from obtaining related work product to refute it.

Life Investors responds that all the documents prepared by or involving the DSI Taskforce and the Project Team and all of their communications with outside counsel are protected by the attorney-client privilege.  These documents do not reflect the performance of ordinary business functions - specifically, insurance coverage functions - as Lindley claims. "Rather, they reflect instances where advice of in-house or outside counsel was sought and received in connection with the discovery of overpayment of claims based on 'actual charges' and implementation of corrections to the company's claims forms and procedures."  *Life*

*Investors' Response*, 9-10 (Dkt. #255).  As such, they are privileged.

In support, Life Investors relies primarily on the Declaration of Mark Edwards for the

following propositions:

> Life Investors began investigating the cause of premium rate increases in early
> 2004. Edwards Decl. ¶ 5. Life Investors recognized that any change to its claims
> practices or procedures could result in litigation and sought advice from in-house
> counsel, Mark Edwards. Edwards Decl. ¶ 6; Adams (Smith) Dep. at 67:2-10,
> 98:9-23 (stating that the Taskforce sought a legal review from Mr. Edwards).[16]
> Aware of the risk of litigation stemming from a correction of the company's
> claims procedures for benefits based on "actual charges" issue, in October 2004,
> Life Investors retained the law firm of Jorden Burt LLP as outside litigation
> counsel to provide legal advice and to represent the company in anticipated
> litigation. Edwards Decl. ¶¶ 7-8. Likewise, the documents generated by the
> Project Team identified in Life Investors' privilege log, though not responsive to
> plaintiff's requests for production, are protected by the attorney-client privilege
> because they reflect instances where the Project Team sought legal advice from
> in-house and outside counsel in connection with the implementation tasks it
> assumed. Edwards Decl. ¶ 10.

*Life Investors' Response*, 10 and *Declaration of Mark H. Edwards*, Ex. C (Dkt. #255).

In addition to the above, Life Investors cites the following from Edwards' Declaration to

support its attorney-work product protection of the documents listed  in the Lindley Log and

SPL:

> 6. My involvement with the DSI Taskforce was to provide legal analysis
> and litigation-related advice. I recognized in May 2004 that any
> correction of Life Investors' claims practices or procedures could result in
> litigation by policyholders, and I consulted with several law firms from
> May through October 2004 to obtain legal advice and seek possible

---

[16] Adams' testimony is not very clear on whether the Taskforce was seeking legal advice from
Edwards. When asked "And did any – did the taskforce rely on legal advice for any of the work that it
did?", Adams responded "No." Adams Deposition 67:13-16 (Ex.7, Dkt. #222). Yet, later in his
deposition, when questioned whether there was any other review of the DSI Taskforce's work other than
the review of marketing materials, Adams responded "The only other thing I can think of was asking for a
legal review." And in response to the follow-up question "Without disclosing any communications with
your lawyers, would you state from whom you sought a legal review?", Adams, responded "Mark
Edwards." *Id*. at 98:9-14, 20-23.

representation for the Companies.
7. In October 2004, the Companies retained the law firm of Jorden Burt
LLP as outside litigation counsel to provide legal advice and to represent
the company in anticipated litigation over the "actual charges" issue.
Jorden Burt would not have been retained but for the risk of litigation.

*Life Investors' Response*, 13 and *Declaration of Mark H. Edwards*, ¶¶ 6 & 7, Ex. C (Dkt. #255).

Life Investors also cites the Declaration of Markham R. Leventhal ("Leventhal"), a

litigation partner in the law firm of Jorden Burt LLP.   Leventhal attests, *inter alia,* that Life

Investors retained Jorden Burt in October 2004 as counsel "to provide legal advice and analysis

in connection with anticipated litigation involving cancer insurance policies that pay benefits

based on the 'actual charges' for certain treatments or services"; it completed its legal analysis of

litigation risks associated with those policies in anticipation of litigation in its Legal Report on

April 20, 2005; and to ensure confidentiality, limited distribution of the Report to "seventeen

high-level company employees and key personnel."  *Declaration of Markham R. Leventhal*, Ex.

G (Dkt. #255).

Edwards further attests that as a member of the Project Team, he provided legal analysis

and litigation-related advice regarding updating and implementing Life Investors' claims forms

and procedures for insuring proper proofs of loss were submitted by policyholders and Life

Investors was accurately paying "actual charges"; *i.e.*, "drafting and revision of the written

materials that were to be used to train claims examiners and customer service representatives

regarding the corrected procedures and in responding to policyholder inquiries." *Declaration of*

*Mark H. Edwards*, ¶¶ 9 & 10, Ex. C (Dkt. #255).

**1.    "At issue" waiver**

At the November 13, 2009 hearing, Life Investors represented that it would not be

relying on advice of counsel, legal analysis of the Policy or the state of the law at the relevant time to establish its good faith or prove any of its claims against Lindley, including the declaratory judgment claims, contract breach of good faith and fair dealing, unjust enrichment and money not received because Life Investors may have overpaid their claims.[17]   It asserts that these claims relate only to the eight claims Lindley submitted starting in February 2007, months after the effective date of § 3651.  In other words, even though Life Investors is relying on Edwards', Leventhal's, and Adams' testimony that Edwards' involvement with the DSI Taskforce and Project Team was to provide "legal analysis and litigation-related advice," and Leventhal's involvement was "to provide legal advice and analysis in connection with anticipated litigation involving cancer insurance policies that pay benefits based on the 'actual charges' for certain treatments or services," Life Investors states it will not rely on this evidence to prove its claims or defend Lindley's claims (although it still maintains that the facts do not support "at issue" waiver under *Cardtoons*..

Life Investors' confidence in avoiding waiver based on the facts in this case may be misplaced.  As the Court understands the argument, Life Investors is asserting that even if it were relying on legal advice to establish the reasonableness of its refusal to pay the billed amount of Lindley's eight claims, the facts would not support a finding of "at issue" waiver.  The

---

[17]  Life Investors' counsel stated the following at the hearing:
We do not invoke our reliance upon the subjective belief or mental state at the time of the law at the time of the correction. . . .  We don't have a single defense or a counterclaim that Life Investors acted reasonably based upon what they knew about the law or that the law permitted the action it took.  We have not invoked that.  We do not rely on advice of counsel. . . . We're not trying to use this as a sword and shield. . . . We are not asserting that we reasonably relied on the state of the  law and then turning around and saying oh and we acted in good faith on that basis.  So we're not using the privilege to preclude counsel from learning what our legal knowledge was.  We haven't done this in this case.  There has been no express or implied waiver of the privilege. . . .

Court is not so confident.

Unlike *Cardtoons*, Life Investors has brought counterclaims for declaratory judgment and money damages against Lindley, affirmative acts that would put its legal advice at issue by making it relevant to the case.  In Lindley's original suit, Case No. 08-CV-379-CVE-PJC, Life Investors seeks the following declaratory relief:

> (I) a declaration that the Policy does not require or obligate Life Investors to pay benefits for arbitrary "list" prices or "chargemaster" prices created by hospitals or other medical providers in situations where, as here, such "list" prices are not genuinely being billed to, charged to, or paid by the insured under the policy or any third party expected to pay for the insured 's medical care;
> (ii) a declaration that the "actual charges" for medical or other services under the terms of the Policy cannot reasonably be interpreted to mean a hospital's or other healthcare provider's arbitrary and often grossly inflated "list" prices in situations where, as here, such "list" prices are not genuinely being billed to, charged to, or paid by the insured under the Policy or any third party expected to pay for the insured's medical care;
> (iii) a declaration that Life Investors has fully performed consistent with the terms of the Policy and that Life Investors has paid all benefits due under the Policy;
> (iv) a declaration that Life Investors has paid all claims due under the Policy as required by applicable statutes, including Okl. Stat. Ann. Title 36, § 3651.
> (v) a declaration holding that Life Investors has processed and paid all claims and in good faith; . . .

*Answer and Counterclaim* (Dkt. #10) (emphasis added).

And in Lindley's class action lawsuit, Case No. 09-CV-429-CVE-PJC (consolidated with this case),  Life Investors brought the following counterclaims: (1) breach of contract for failing to provide proper proof of loss; (2) bad faith breach for failing to submit proper proofs of loss and thereby withholding documents and information regarding the actual expenses and loss incurred in an effort to deceive and mislead Transamerica as to real actual charges; (3) unjust enrichment as Lindley has been overpaid due to his failure to provide proper proof of loss therefore he should not be allowed to retain the excess; (4) money had and received;  (5)

declaratory judgment clarifying the interpretation of the Policy language and finding that

Lindley's  recent submitted claims do not constitute adequate written proof of loss under the

policy.   *Transamerica Life Insurance Company's Answer and Counterclaim* (Dkt. #14 in Case

No. 09-CV-429-CVE-PJC).  In support of these claims, Life Investors alleges, *inter alia,* the

following: (1) Despite Transamerica's letter on January 27, 2006 advising Lindley that from

April 1, 2006 forward he was to follow the amended claims forms and procedures for any claims

and to provide information showing payments or adjustments from Medicare as well as actual

charges, Lindley failed to do so when he filed claims on February 27, 2007 to the present for

medical services provided by Urologic Specialists of Oklahoma that were provided from May

30, 2006 through the present. (2) For claims made after April 1, 2006, when the claim form and

procedures were made effective (claims on 2/27/07, 4/2/07, 8/1/07, 12/3/07, 4/8/08, 7/16/08,

10/24/08, and 2/10/09), Lindley has submitted a Claimant's Statement and Claim Form 1500

which does not state the "actual charges."

Based on the allegations and the counterclaims, the Court cannot rule out that Life

Investors' affirmative acts in making these allegations and bringing these claims against Lindley

"put the protected information at issue by making it relevant to the case." *Cardtoons*, 199

F.R.D. at 681 (quoting *Hearn*, 68 F.R.D. at 580).  Neither can the Court say that the information

is not vital to his defense.  The Court is curious as to how Life Investors intends to defend

Lindley's bad faith breach of contract claim against it without the protected information.  If Life

Investors is assuming that it can make the protected information irrelevant by relying on

Lindley's claims being filed after November 1, 2006, the effective date of § 3651, the Court

would point out that Chief Judge Eagan has not yet ruled on whether § 3651, even if interpreted

as Life Investor urges, governs  Lindley's claims for medical services received between January 1, 2006 and November 1, 2006.

In spite of its reservations stated above, based on Life Investor's representation that it will in no way rely on the protected information, the Court does not find implied waiver of any attorney-client or attorney work product protection.  However, Life Investors is reminded that it is bound by its decision in marshaling and presenting its evidence in dispositive motions or at trial.

2. **"Rebuttable presumption" regarding investigatory files in bad faith insurance claims**

As the Court has observed in its general discussion above, there are often no clear answers to privilege issues due to the fact-dependent case by case analysis that is required.  This is particularly true in the context of insurance bad faith claims. *See* 8 Charles Alan Wright, Arthur R. Miller, Richard L. Marcus, Federal Practice and Procedure §2024 (2d ed. 1987) (hereafter, "Wright & Miller") ("Reports prepared by or for insurers present particular difficulties as responding to claims and preparing for resulting litigation are significant parts of the ordinary business of insurers.").  Most courts have adopted a rebuttable presumption that neither attorney work product nor attorney-client privilege protects an insurer's investigatory file on an insured's claim from discovery before a final decision is made:

> Fed.R.Civ.P. 26(b)(3) requires that a document or thing produced or used by an insurer to evaluate an insured's claim in order to arrive at a claims decision in the ordinary and regular course of business is not work product regardless of the fact that it was produced after litigation was reasonably anticipated. It is presumed that a document or thing prepared before a final decision was reached on an insured's claim, and which constitutes part of the factual inquiry into or evaluation of that claim, was prepared in the ordinary and routine course of the insurer's business of claim determination and is not work product. Likewise, anticipation of litigation is presumed unreasonable under the Rule before a final decision is

28

reached on the claim. The converse, of course, is presumed for documents produced after claims denial. To overcome these presumptions, the insurer must demonstrate, by specific evidentiary proof of objective facts, that a reasonable anticipation of litigation existed when the document was produced, and that the document was prepared and used solely to prepare for that litigation, and not to arrive at a (or buttress a tentative) claim decision.

*Harper v. Auto-Owners Ins. Co.,* 138 F.R.D. 655, 663-664 (S.D.Ind.1991).[18] *See also Milinazzo v. State Farm Ins. Co.,* 247 F.R.D. 691, 700-701 (S.D.Fla. 2007) (applying rebuttable presumption and finding that documents prepared before the final decision on an insured's claim were not protected under the attorney work product doctrine; nor were they privileged); *S.D. Warren Co. v. Eastern Elec. Corp.,* 201 F.R.D. 280, 285 (D.Me.2001) ("[T]he better rule is to hold that unless and until an insurance company can demonstrate that it reasonably considered a claim to be more likely than not headed for litigation, the natural inference is that the documents in its claims file that predate this realization were prepared in the ordinary course of business,

---

[18] The *Harper* court provided the following guidance in determining whether "an adequate showing" has been met:

> Defining precisely what an adequate showing would consist of is best left to case-by-case development. The factors determining a reasonable anticipation of litigation are already well-developed in the case law. Without attempting a comprehensive list, an insurer seeking to overcome the second presumption and convince a court that documents and things produced prior to a claims decision were produced or used solely for litigation purposes could show, for example, that reliable and convincing evidence established the existence of all elements necessary for a good faith claims denial such that it was improbable that any reasonably foreseeable results of later investigations would change that decision (and that only bureaucratic process delayed a final decision) or he could show a complete segregation of the subject documents from the insurer's claims evaluators and decision-makers ( e.g., the insurer's counsel ordered the investigations and the results remained isolated in the legal department). In the former instance, most of the evidence would unavoidably be duplicative of the evidence for the insurer's case in chief.

*Harper,* 138 F.R.D. at 664 n.4. In any case, there is no "bright line" defining when routine, ordinary business transforms into legal advice or analysis for purposes of attorney-client privilege or in anticipation of litigation. *Heffron v. The District Court of Oklahoma County*, 77 P.3d 1069, 1079 (Okla. 2003) ("[T]he point [where litigation can be anticipated] is not fixed, but may vary depending on the nature of the claim and the type of investigation conducted.").

i.e., the business of providing insurance coverage to insureds."); *U.S. Fire Ins. Co. v. Bunge North America, Inc.,* 247 F.R.D. 656, 659 (D.Kan. 2007) ("[T]he question of whether insurer and adjuster documents were created in anticipation of litigation depends on whether the party seeking protection can point to a definite shift made by the insurer or adjuster from acting in its ordinary course of business to acting in anticipation of litigation.").

While these cases pertain to an insurer's investigation and denial of claims, the same inquiry applies here. Although this case involves a change in insurance policy terms/claims procedure, it is no less a business function of the insurer than claims investigation. If anything, the review of premium increases and loss ratios is more closely tied to a business function and more tangential to "anticipated litigation."

The parties' different characterizations of Jorden Burt's report reflects their attempts to analogize or distinguish case law involving insurance investigatory reports: Lindley refers to it as a "coverage analysis," likening it to an insurance claim investigatory report; while Life Investors casts it as a "legal report" created in anticipation of litigation. Yet, as noted above, the issue is not whether the Jorden Burt Report, for example, is an investigatory report *per se*; but whether the "primary motivating purpose" behind the creation of the report, was to aid in possible future litigation (attorney work product) or to provide legal – as opposed to business – advice (attorney-client privilege). *See Accounting Principals*, 2009 WL 2252123, at *7 ("The test for work-product protection turns on the *primary purpose* for which the documents were created.") (citing *Marten*, 1998 WL 13244, at *10)); *Neuberger Berman*, 230 F.R.D. at 411 ("A related inquiry [to whether the primary purpose of the client's communication with the lawyer is to obtain legal advice] is whether the advice sought and given is in the nature of business, as

opposed to legal.")

### 3. Corporate client

Further complicating the attorney-client privilege analysis here is the involvement of in-house counsel, Edwards, and his shifting roles as Assistant General Counsel of the corporation and a member of the DSI Taskforce and the Project Team (question of the attorney's capacity or status) and whether he is acting as counsel to Life Investors or as the client. In order to cloak the correspondence and documents produced by the DSI Taskforce and Project Team with attorney-client privilege, Life Investors depicts Edwards as receiving confidential communication from and offering legal advice pertaining to that confidential communication to the other members of the DSI Taskforce and Project Team. However, it is unclear whether Edwards is acting as "client" or co-counsel when he attests that he consulted with "several law firms from May through October 2004 to obtain legal advice and seek possible representation for the Companies." *Edwards Declaration*, ¶¶ 6-7 (Dkt. #255). *See, e.g., Hercules, Inc. v. Exxon Corp.*, 434 F.Supp. 136, 146 n.7 (D.Del.1977) (finding that communications with members of a corporate legal department were entitled to attorney-client privilege because they acted as attorneys with respect to communications from nonlegal employees of the corporation and as representatives of the client when relaying information or requesting advice from outside counsel).

The Court could not find, nor have the parties cited, any Oklahoma cases identifying the persons representing the corporate client for purposes of attorney-client privilege and attorney work product. *See* Leo H. Whinery, *Representative of the Client - Corporations*, 3 Okla.Prac., Okla. Evidence §36.06 (2d ed. 2009) (hereafter, "Whinery") ("Who, for purposes of the

31

privilege, is the 'representative of the client' in the case of the corporation? The issue appears never to have arisen in Oklahoma, either before, or after, the enactment of the Code. Most of the decisions in this area are recent and largely federal.").  However, section 2502 (A) of title 12 of the Oklahoma Statutes recognizes a corporation as a client and defines "representative of the client" as "one having authority to obtain professional legal services, or to act on advice rendered pursuant thereto on behalf of the client." Okla.Stat.tit.12, § 2502(A)(3) and (4).  Thus, as Whinery asserts, Oklahoma appears to adopt the "control group" test as more clearly set forth in *City of Philadelphia v. Westinghouse Electric Corp.*, 210 F.Supp. 483 (E.D.Pa. 1962):

> [i]f the employee making the communication, of whatever rank he may be, is in a position to control or even to take a substantial part in a decision about any action which the corporation may take upon the advice of the attorney, or if he is an authorized member of a body or group which has that authority, then, in effect, he is (or personifies) the corporation when he makes his disclosure to the lawyer and the privilege would apply. In all other cases the employee would be merely giving information to the lawyer to enable the latter to advise those in the corporation having the authority to act or refrain from acting on the advice.

*Id.* at 485; *see also Natta v. Hogan*  392 F.2d 686, 692 (10th Cir. 1968) ("Another difficult question is what officers and employees of Phillips are in a position to speak for the company within the meaning of the word 'client.' We believe that the test is whether the person has the authority to control, or substantially participate in, a decision regarding action to be taken on the advice of a lawyer, or is an authorized member of a group that has such power.").[19]

---

[19]   The Supreme Court, applying federal common law, eschewed a strict control group test in favor of a case-by-case determination of the following factors: (1) whether the communications were made by employees to corporate counsel in order for the corporation to secure legal advice; (2) whether the employees were cooperating with corporate counsel at the direction of corporate superiors; (3) whether the communications concerned matters within the employees' scope of employment; and (4) whether the information was not available from upper-echelon management.  *Upjohn Co. v. United States*, 449 U.S. 383, 394 (1981).  There is, however, no Oklahoma law adopting the broader gloss of *Upjohn*.

Unfortunately, Edwards' Declaration, conclusory as it is, provides no enlightenment.

From the Court's *in camera* review of the documents, it appears that Adams (an authorized corporate "control group" member) delegated responsibility to the members of the DSI Taskforce, including Edwards, to explore possible solutions to the problems of increasing loss ratios and premium rates for the DSI policies.  Gwin was appointed head of the Taskforce, and its members included employees from nonlegal departments of the company, as well as Edwards from the legal department.  The DSI Taskforce had no authority to control any decision regarding action to be taken on the advice of outside counsel, although arguably the taskforce members substantially participated in the decision.

### 4.    *In Camera* Review of Documents

Based on its review of the Lindley Log documents set forth in the CPL 1-386 and the SPL, the Court finds that Life Investors did not "anticipate litigation" until it consulted with the law firm of Jorden Burt, LLP on October 19, 2004.  Until that time, the DSI Taskforce was convened for the business purpose of consider possible solutions to avoid or mitigate the effect of rising premium rates of the DSI policies.  And the documents created during that time period were generated in the ordinary course of business and would have been created regardless of any potential litigation.  Because the primary motivation for the creation of the documents prior to October 19, 2004 was not to aid in possible future litigation, they are not protected from discovery as attorney work product.

To determine whether the documents are privileged, the Court has organized the documents created prior to October 19, 2004 chronologically, combining documents from the CPL and SPL.  The first group of documents are communications between Edwards or Edwards

and other members of the DSI Taskforce and Chuck Dauphin ("Dauphin") and Bill Baxley

("Baxley") of the Baxley, Dillard, Dauphin & McKnight law firm ("Baxley, Dillard").

There is no indication in the record that Baxley, Dillard was retained by Life Investors as

legal counsel or that they were consulted for any reason other than sharing whatever insight and

experience they had in attempting to reduce payments on their insurance client's cancer claims.

The documents consist of fax cover sheets and emails with and without attachments, Gwin's

handwritten notes, a copy of a case and several drafts of a memo authored by Edwards regarding

his investigation into "ways to better manage claims on the DSI cancer insurance that we

administer."  LIPriv-Lindley 0165-0167 are fax cover sheets from Edwards to Baxley and

Dauphin and do not contain any confidential communication or legal advice.  *Guidry v. Jen*

*Marine LLC*, 2003 WL 22038377, at *2 (E.D.La.) ("Correspondence that merely transmit

documents to or from an attorney, even at the attorney's request for purposes of rendering legal

advice to a client, are neither privileged nor attorney work product.").  The attachment to LIPriv-

Lindley 0166 is a summary of cancer insurance policy language that Edwards "discussed" with

Baxley and Dauphin with no indication of confidentiality.  LIPriv-Lindley 0168-0169 are

identical lists of questions regarding claims on supplemental cancer insurance policies and,

although marked "Privileged and Confidential Attorney-Client Communication and/or Attorney

Work product," are neither, as they were questions for discussion in a conference call with DSI

Taskforce members Edwards, Gwin, Adams and James Byrne ("Byrne"), Director of Claims, and

Baxley and Dauphin and serve "mixed purposes because they were sent to both lawyers and non-

lawyers for both legal and non-legal purposes (and therefore not primarily for legal assistance)."

*In re Vioxx Products Liability Litigation*, 501 F.Supp.2d 789, 810 (E.D.La. 2007).  LIPriv-

Lindley 0154 contains Gwin's handwritten notes regarding the conference call and is not a communication.  LIPriv-Lindley 0119 is a fax cover sheet from Dauphin to Edwards attached to two state Department of Insurance opinions on the legal definition of "actual charge," and a memorandum.  Although the fax cover is not privileged or protected, the attachments are work product from litigation that is closely-related in subject matter and thus are protected.  *See Frontier Refining*, 136 F.3d at 703-704.  LIPriv-Lindley 0170 is not privileged as it is simply a copy of a case without any context, identified sender or recipient, although the SPL identifies the source of the case to be Edwards.

There are draft and final versions of a memo from Edwards to his supervisor, David Goldstein ("Goldstein"), General Counsel of Life Investors, dated June 14 and June 22, 2004, which are labeled "PRIVILEGED AND CONFIDENTIAL ATTORNEY-CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT" reciting, in part, information Edwards purports to have received from Baxley and Dauphin.  The drafts and memo, LIPriv-Lindley 0120, 0173, 0002, 0020, 0104 are mixtures of legal and business information which the Court finds primarily business-related and therefore not privileged in that they recite the results of the DSI Taskforce's investigation of "ways to better manage claims on the DSI cancer insurance."  Further, Life Investors has failed to establish the confidentiality of these documents. The draft with Edwards' handwritten notes, LIPriv-Lindley 0173, and the memo, LIPriv-Lindley 0020, were circulated to Adams, and LIPriv-Lindley 0020 was also circulated to Gwin and other in-house counsel, Middleton P. Ray, Deborah L. Alexander ("Alexander") and Goldstein.

There are two email strings of correspondence among in-house counsel, Edwards, Alexander and Goldstein, LIPriv-Lindley 0175 and 0021, originating with Alexander on July 8,

2004 and attaching the referenced case on July 9, 2004, in which the counsel discuss the terms of the policies. Again the discussion serve mixed purposes and although addressed only to in-house counsel, the following two email strings, LIPriv-Lindley 0065 and 0105, incorporate LIPriv-Lindley 0175 and the discussion therein is shared with non-legal DSI Taskforce members Adams and Gwin, thus indicating they were not created primarily for legal assistance. *Vioxx Products*, 501 F.Supp. 2d at 810.

On July 23, 2004, with Goldstein's approval, Edwards contacted Bruce Shirk ("Shirk"), a partner at Powell Goldstein Frazer & Murphy, LLP ("Powell Goldstein"), to retain him and his firm due to their expertise in Medicare law. LIPriv-Lindley 0176 is Shirk's curriculum vitae and would not be privileged except that Edwards' handwritten notes on the CV, if disclosed, would reveal confidential communication he gave in a telephone conference for the purpose of obtaining legal advice. *American Nat. Bank and Trust Co. of Chicago v. AXA Client Solutions, LLC*, 2002 WL 1058776, at *2 (N.D.Ill.). The advice sought by the DSI Taskforce from Shirk requested in the privileged email LIPriv-Lindley 0060 is the effect of Medicare on Life Investors' obligations under the DSI policies and thus is legal in nature. Further, other than Edwards' memo to Goldstein, the attachments to LIPriv-Lindley 0060 are the same work product attached to LIPriv-Lindley 0020 above. LIPriv-Lindley 0066 is an email from Edwards to Adams and Gwin simply updating them regarding information Dauphin was sending on to the DSI Taskforce and reiterating that he had contacted Shirk who would be looking at the issue Edwards requested. There is no legal advice or confidential communication therein.

LIPriv-Lindley 0022 is an email string that includes confidential communications between members of the DSI Taskforce and Shirk relating to the legal advice sought from Shirk,

even though communicated before Shirk "started the clock" on his legal services. The emails in LIPriv-Lindley 0023 and 0067, however, although provided by Gwin in response to Shirk's request, is not privileged as it does not consist of material that would have been privileged in the hands of the client, Life Investors. *Burton*, 170 F.R.D. at 485. LIPriv-Lindley 0024, 0139, and 0025 are privileged emails from Edwards to Shirk and copied to Goldstein and Gwin which provide Shirk with legal argument based on the July 27, 2004 letter from Dauphin to Edwards and its attachment, LIPriv-Lindley 0177. LIPriv-Lindley 0029 and 0030 have been misdated in the CPL as created in July 2004 although they are dated August 23, 2004 and August 30, 2004, respectively. Both are privileged. Although LIPriv-Lindley 0029 also includes the non-privileged email from Gwin to Shirk dated July 28, 2004, there is no need for redaction in order to produce the non-privileged portion as the identical Gwin email is being produced in LIPriv-Lindley 0023 and 0067 above.

LIPriv-Lindley 0183 is the executed copy of the retention agreement between Life Investors and Powell Goldstein which substituted the incorrect copy LIPriv-Lindley 0181. These copies of the retention agreements are not privileged, nor is the purpose of the retention contained therein. *Diversified Ind., Inc. v. Meredith*, 572 F.2d 596, 603 (8th Cir. 1997), *aff'd*, 572 F.2d 59 (8th Cir. 1978) (*en banc*) (No confidential information was revealed when the memorandum "did little more than reveal the relationship between the parties, *the purpose for which Law Firm had been engaged, and the steps which the Firm intended to take in discharging its obligation* to Diversified." ) (emphasis added); *Burton*, 170 F.R.D. at 484 ("A general description of the work performed by the attorney is not protected by the privilege.").

The following email strings include confidential communication between members of the

DSI Taskforce and Shirk and his firm and/or legal advice based on that communication and are therefore not discoverable: LIPriv-Lindley 0068,[20] 0185, 0186, 0031, 0187, 0188, 0032, 0190, 0034, 0059, 0103, 0140, 0191, 0192, 0189.  LIPriv-Lindley 0035 and 0036 are privileged communications between Edwards and Goldstein regarding the legal advice provided by Shirk in his PowerPoint presentation.  LIPriv-Lindley 0037 contains a legal memo from Robert Falk ("Falk") at Powell Goldstein to Edwards which is also privileged.  Further, Edwards updated his original memo first on September 28, 2004 and then on September 29th and 30th to include the legal advice regarding Medicare provided by Shirk and his firm and shared the memo with Adams and Gwin, who edited the memo, as well as with in-house counsel Goldstein, and Jill Murphy ("Murphy") and Jerry Lax ("Lax") in Life Investors' Complex Litigation Department.  Because the updates to Edwards' original memo are based in part on the privileged legal advice provided by Powell Goldstein, the Court directs Life Investors to redact Edwards' final memo from the copies of the updated and edited memos in LIPriv-Lindley 0003, 0155, 0118, 0038, 0193, 0070 and 0072 of the privileged communication and produce it to Lindley with a copy of the redacted and unredacted document to the Court, as well as any required redaction in the emails attached to Edwards' memo in LIPriv-Lindley 0071-0073 and 0193.

The remaining documents prior to October 20, 2004, LIPriv-Lindley 0184, 0026, 0027, and 0194 should be produced in their entirety.  The Court could not locate LIPriv-Lindley 0063 but from the description on the CPL it appears that it would not be privileged in light of the

---

[20]   LIPriv-Lindley 0068 likewise does not have to be redacted of non-privileged material contained therein as it is the July 28th email from Gwin to Shirk which will be produced to Lindley.

Court's other rulings.  If Life Investors wishes to take issue with that, it should produce the document and any requested redaction to the Court when it produces the redacted Edwards' final updated memo and emails above.

The Court has also reviewed Life Investors' suggested redactions to LIPriv-Lindley 0016, 0017, 0018, 0064, 0091, and LIICA 005168 and 005171 and finds no basis for redaction of any of the documents.  None of the documents is protected by attorney work product as each was created before Life Investors consulted with Jorden Burt on October 19, 2004 which is the date the Court finds that Life Investors' primary motivation shifted from the ordinary course of business of determining how best to counter the high loss ratio and high premium increases of its DSI policies to anticipating litigation based on its solution of changing the meaning of "actual charges" or, in its view, changing the claims procedure.  Further, none of the documents is privileged.  LIPriv-Lindley 0016 is a memo from Gwin to all the members of the DSI Taskforce, all of them non-legal members, except for Edwards.  Edwards' presence at the meeting and as a recipient of the email does not convert Gwin's communication into a privileged one.  *Audiotext Communications Network, Inc. v. US Telecom, Inc.*  1995 WL 625962, at * 7 (D.Kan.) ("The privilege does not extend to every communication to which an attorney is party or privy.  It exists only for those confidential communications which occur between an attorney and client in the course of giving or requesting legal advice and to which other persons have not become privy.")

Neither does describing Edwards as "owner" of an idea in the list of DSI Cancer Claims Taskforce Possible Solutions privilege his idea with confidentiality in LIPriv-Lindley 0018, 0064.  Similarly, in LIPriv-Lindley 0091, Gwin, as the head of the DSI Taskforce is addressing

Adams and Edwards about a financial issue that looks "suspicious," and not seeking legal advice from Edwards.  And, as the Court found above regarding Edwards' and Gwin's handwritten notes, LIICA 005168 and 005171 are not "communications" and thus not privileged.

As for documents created on or after October 20, 2004, they are protected as attorney work product with the following exceptions.  LIPriv-Lindley 0107 consists apparently of the handwritten notes of Neva Curtis, a non-legal member of the DSI Taskforce, on DSI claims handling and is neither privileged nor attorney work product.  The emails in the following documents are not discoverable but their attachments are as the attachments were created prior to October 19, 2004 in the ordinary course of business and are not privileged: LIPriv-Lindley 0040, 0061, 0015, 0050, 0251.  The email in LIPriv-Lindley 0249 from David Callen and the copies of attachments as well as the grid Gwin prepared "about a year" before his January 3, 2005 email, LIPriv-Lindley 0045, and attached thereto, should also be produced.

Lastly, the Court has reviewed the Jorden Burt report and LIPriv-Lindley 0131, a draft of the Inter-Company Correspondence from Whitlock to Alexander and Byrne dated July 22, 2005.  The Jorden Burt report is protected by attorney work product and/or attorney-client privilege, except for Exhibit B, a list of Marketing Materials, and Exhibit C, part of Gwin's grid attached to his January 3, 2005 email in LIPriv-Lindley 0045.  The draft Whitlock memo attached to a fax cover in LIPriv-Lindley 0131 is discoverable.  Although it contains the handwritten notes of Edwards, they are simple editing notations and were either incorporated for disclosure to third parties in the Whitlock memo and/or do not contain any confidential information communicated by the client to the attorney that is maintained in confidence.  *Softview Computer Prods. Corp. v. Haworth, Inc.*, 2000 WL 351411, at *15 (S.D.N.Y.) ("Drafts of documents prepared by an

attorney for transmission to third parties are protected by the attorney-client privilege only where the draft document contains confidential information communicated by the client to the attorney that is maintained in confidence."); *American Nat. Bank and Trust Co. of Chicago v. AXA Client Solutions, LLC,* 2002 WL 1058776, at *2 (N.D.Ill.) ("Courts have held that parts of draft letters ultimately disclosed to third parties via the final version of the letter must be disclosed due to waiver.");  *Schenet v. Anderson*, 678 F.Supp. 1280, 1284 (E.D.Mich.1988) ("The privilege is waived only as to those portions of the preliminary drafts ultimately revealed to third parties.").

Based on the findings above, the Court **GRANTS Plaintiff's Motion to Compel Documents Identified Nos. 1-386 on Defendant's Consolidated Privilege Log (Dkt. #222) in part and DENIES it in part.**  Life Investors is to produce the non-privileged and/or unprotected documents ordered above, either in redacted or non-redacted form as instructed, on or before Tuesday, February 23, 2010.

2.      **Plaintiff's Sixth Motion to Compel Information Concerning Defendant's Knowledge and Consideration of "Actual Charges" Opinions (Dkt. #156) and Defendant's Motion for Protective Order from Request No. 40 of Plaintiff's Second Requests for Production (Dkt. #181).**

Lindley moves to compel and Life Investors moves for a protective order against the

production of documents responsive to Plaintiff's Request for Production No. 40.  The subject

Request and Response are as follows:

> **REQUEST NO. 40:** Produce each Document or Communication that analyzes, discusses or concerns any judicial opinion issued with respect to any of the following actual charge litigation matters:
> • Ward v. Dixie Nat. Life Ins. Co.. No. 06-2022, (4th Cir.)
> • Guidry v. American Public Life Ins. Co.. No. 07-30085 (5th Cir.);
> • Conner v. Am. Pub. Life Ins. Co.. No. 4:05CV33-P-B (N.D. Miss.);
> • Hodges v. American Fidelity Assur. Co.. No. 5:06-CV-65 DCB/JMR (S.D. Miss.Mar 17, 2008);
> • Favor v. American Fidelity Assurance Company. No. CJ-2002-6690 (Okla. Co.Okla..8/25/06);
> • Metzger v. American Fidelity Assurance Co.. No. CIV-05-1387-M (W.D. Okla.) and
> • Key v. Central United Life Ins. Co.. No. CV 05-J-0375-S (S.D. Ala.)(4/5/06).
> **RESPONSE:** Life Investors objects to this request to the extent that it seeks information that is subject to the attorney-client privilege, the work-product doctrine, or any other applicable privilege.

Lindley attaches Exhibit 2, an April 12, 2006 letter from Connie Whitlock, VP and COO

of Life Investors to Janet Jones, a Senior Analyst at the OID, enclosing a copy of *Claybrook v.*

*Central United Life Ins. Co.*, 387 F.Supp.2d 1199 (M.D.Ala.2005) to justify the reasonableness

of Life Investors' interpretation of "actual charges."  Lindley argues that since Defendant relied

on the only case which adopted its position, it obviously was aware of the many decisions which

rejected it. And if it did not consider these adverse opinions or chose not to change its position

despite them, Lindley is entitled to discover the rationale for not doing so under the

circumstances. In addition, as Life Investors placed its prior knowledge and analysis of legal

42

precedent at issue when it affirmatively requested declaratory relief, it has waived its objection based on attorney-client privilege.

Pursuant to Rule 37 (a)(5)(B), Life Investors seeks a protective order stating that it is not obligated to produce documents responsive to Request No. 40 or create a privilege log for any responsive documents.  Defendant objects that Request No. 40 is overbroad, seeks irrelevant information and is not calculated to lead to admissible evidence because Life Investors admits it was aware of the cases listed in Request No. 40 and Oklahoma Statute Title 36, §3651 ("§3651") defines "actual charge" as "the amount actually paid by or on behalf of the insured and accepted by a provider for services provided."  Okla. Stat. tit. 36, §3651.  None of the subject cases addresses the impact of §3651.  Defendant also asserts that production of the documents would be unduly burdensome as a preliminary search of its documents using each of the listed cases retrieved over 9,000 potentially responsive documents.[21]

Finally, Life Investors asserts the documents are protected work product as it anticipated that a change in the claim procedures could result in litigation even if it believed its interpretation of "actual charges" was correct.  Lindley has failed to establish a substantial need for the documents or that he is unable to obtain the substantial equivalent of the documents.  As none of the cases address the application of §3651 to Lindley's policy, there is no need for the documents and Life Investors admits it was aware of the opinions.

The Court DENIES Plaintiff's Sixth Motion to Compel Information Concerning Defendant's Knowledge and Consideration of "Actual Charges" Opinions (Dkt. #156) and

---

[21] After its *in camera* review of the submitted documents, the Court finds this statement rather implausible.

43

GRANTS Defendant's Motion for Protective Order from Request No. 40 of Plaintiff's Second Requests for Production (Dkt. #181).  At the November 4th hearing, Lindley admitted that the only reference to *Clayton* in the record is that in Whitlock's letter to the Oklahoma Insurance Department ("OID").  And Life Investors admitted that it knew about the cited decisions and would not rely on *Clayton* or any other legal basis to show the reasonableness of its conduct. Therefore, on relevance grounds alone, the Court denies Lindley's motion.  However, it is also highly likely that any document "that analyzes, discusses or concerns" any of the subject decisions is protected opinion attorney work product and Lindley has not overcome the virtually absolute protection granted opinion work product.

**3.      Plaintiff's Rule 56(F) Motion for an enlargement of time to respond to Defendant's Motion for Summary Judgment (Dkt. #209)**

Although he has filed a response to Life Investors' motion for summary judgment, Lindley requests an extension of time under Rule 56(f) to supplement his response after the production of the requested documents. As Life Investors points out, a Rule 56(f) motion is considered an *alternative* to a response to a motion for summary judgment.  *See Pasternak v. Lear Petroleum Exploration, Inc*., 790 F.2d 828, 833 (10th Cir. 1986) ("The protection afforded by Rule 56(f) is an alternative to a response.")  Rule 56(f) provides:

> If a party opposing the motion shows by affidavit that, for specified
> reasons, it cannot present facts essential to justify its opposition, the court may:
> (1) deny the motion; (2) order a continuance to enable affidavits to be obtained,
> depositions to be taken, or other discovery to be undertaken; or (3) issue any
> other just order.

Fed. R. Civ. P. 56(f).  Life Investors thus contend that Lindley has waived any option for file a Rule 56(f) motion.

The Court need not determine the issue of waiver as the Court finds that +

the discovery allowed herein will not affect the outcome of Life Investor's summary judgment motion.  Lindley requests supplementation of his response to the summary judgment motion based on the following:

> These motions seek the discovery of information regarding, inter alia: (a) Defendant's corporate minutes and records regarding its unilateral modification of its interpretation of the phrase "actual charges" as applied to its various policies; (b) Defendant's knowledge regarding the legality of §3651 and its potential unconstitutionality; (c) Defendant's knowledge of other opinions regarding "actual charges"; (d) Defendant's knowledge and understanding of steerage discounts; (e) Defendant's reliance on legal advice and its knowledge regarding the potential illegality or unconstitutionality of § 3651.

*Affidavit of Tony Gould*, Ex. A ¶8 (Dkt. # 209).  None of the discovery granted in Lindley's motion to compel (Dkt. #222) relates to any of these issues. The Court accordingly denies Plaintif's Rule 56(F) Motion for an Enlargement of Time (Dkt. #209).

IT IS SO ORDERED, this 17th day of February, 2010.

_____

Paul J. Cleary
United States Magistrate Judge